UNITED STATES of America,
Plaintiff-Appellee,

v.

Waverly THOMPSON, Defendant-
Appellant.

No. 72-1138.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 30, 1972.

Decided March 8, 1973.

Rehearing En Banc Denied
April 9, 1973.

Jerome Rotenberg, Chicago, Ill., for defendant-appellant.

James R. Thompson, U. S. Atty., William T. Huyck and Terry Gordon, Asst. U. S. Attys., Chicago, Ill., for plaintiff-appellee.

Before KNOCH, Senior Circuit Judge, and CUMMINGS and PELL, Circuit Judges.

KNOCH, Senior Circuit Judge.

Defendant-Appellant, Waverly Thompson, has taken this appeal from his con-

viction in a jury trial on an indictment which charged, in one count, that he and three co-defendants had conspired, in violation of Title 18 U.S.C. § 371, to transport forged securities in interstate commerce and, in seven other counts, that one co-defendant, Dayo Nagel, had committed substantive violations, aided and abetted by this defendant and co-defendants George Wright and Ionia Coleman, in violation of Title 18 U.S.C. §§ 2 and 2314. Defendant was sentenced to serve five years on each count, to run concurrently.

The conspiracy alleged included a program entailing theft of eight blank checks of the Apex Smelting Company by Ionia Coleman, an employee of Apex, who was to give these checks to her brother, George Wright, who, in turn, would give them to defendant, Waverly Thompson. These checks were to be forged and falsely completed to appear to be checks issued by Apex. George Wright and defendant would cause the checks to be sent to Dayo Nagel, in North Dakota, who would negotiate them. These checks would return to Chicago from Bismarck, North Dakota, in interstate commerce. Dayo Nagel was to divide the proceeds with the other defendants. A part of the alleged conspiracy was concealment of the purpose of and the acts done in furtherance thereof. Co-defendants George Wright and Ionia Coleman pleaded guilty to all counts and codefendant Dayo Nagel pleaded nolo contendere to Count One. All three testified at the trial of this defendant.

Mrs. Coleman testified that she told her brother George Wright about the lax security at Apex and the ease of acquiring Apex checks and that she said she could cover thefts at the time she reconciled the Apex bank statements. On December 12, 1970, a Saturday, she did in fact steal about eight blank checks with copies of authorized signatures and stickers for the envelopes. Her brother told her that defendant had said the name on the checks would be Nagel Grain and Seed Company.

George Wright testified that defendant spoke of having an outlet and asked him whether he could acquire checks, whereupon George Wright told defendant about his sister and it was agreed that defendant's source "in the north" would get one-half of the proceeds with one-fourth going to Mrs. Coleman and the last quarter split between defendant and Mr. Wright.

Dayo Nagel testified that he had a conversation in Chicago late in November or early in December 1970, in the course of which defendant said he "had some things going" and could probably assist Mr. Nagel who needed between $30,000 and $35,000 for his feed business in North Dakota. On or about December 10, 1970, Mr. Nagel received a telephone call from defendant who spoke about a check and thought he might have something to send Mr. Nagel.

The following Sunday, evidently December 13, 1970, defendant again telephoned Mr. Nagel, told him to return $10,000 of the proceeds of a $20,000 check, being sent him. Mr. Nagel received an Apex check for $20,000 payable to his company on December 16, 1970, which he deposited in his company's account at the Dakota National Bank in Bismarck, North Dakota.

This check was apparently the check to which Mr. Wright referred when he testified that he received a blank Apex check, together with a canceled Apex check and stickers from his sister which he took with him when he visited defendant, with whom he agreed to make out the check for $20,000. On instructions of defendant, Mr. Wright said he typed the check as payable to "Nagel's Grain and Feed Company in Bismarck, North Dakota," and forged the signature. The two men drove to a post office and Mr. Wright mailed the check. Also at defendant's request, Mr. Wright drove to North Dakota in an automobile rented by defendant to pick up $10,000.

The same day, December 18, 1970, Mr. Nagel received telephoned instructions from defendant to deliver $10,000 in

cash to defendant's messenger. He made that delivery. He also mailed a check for $2,500 directly to defendant which came back canceled, bearing endorsement in defendant's name.

Defendant met Mr. Wright at the latter's home in Chicago and indicated dissatisfaction with the $1,300 he had received as his share. When, a few days later, Mr. Wright brought defendant the seven remaining blank Apex checks, already filled out and forged, defendant said other arrangements had been made and he would call Mr. Wright when the funds were received. However, no more money came to Mr. Wright.

Mr. Nagel received and deposited another Apex check payable to Nagel Grain and Feed Company in the amount of $25,000 on December 22, 1970. In a telephone conversation on December 28, 1970, defendant asked him to take only one-third of the proceeds of these checks which in future would be handled by them alone.

Accordingly Mr. Nagel withdrew $17,000 from his account, $16,700 of which he delivered to defendant in Chicago, in return receiving five more Apex checks in amounts of $16,000 to $25,000. He deposited a $25,000 check on December 30, 1970, an $18,000 check on January 4, 1971 and three checks totaling $60,639 on January 5, 1971, in another bank, Farmers and Merchants Bank of Sheyenne, North Dakota.

Meanwhile Mrs. Coleman's job had changed and she was no longer in a position to handle the checks returned from the bank. She told her brother early in January 1971 and he told defendant who said that nothing could now be done about that.

On January 11, 1971, Mr. Nagel was arrested on a State charge of intent to defraud the Dakota National Bank of Bismarck. When Mr. Nagel was released on bond, he came to Chicago where he met with defendant and Mr. Wright who testified to a conversation wherein Mr. Nagel said he delivered between $27,000 and $29,000 which he wanted back to deposit in his own account. Mr. Wright had denied all knowledge of this money. Mr. Nagel also testified that in this conversation Mr. Wright had denied receiving his share of the $17,000.

Defendant contends that the Court failed fully to instruct the jury on the essential elements of the conspiracy charged in the indictment. Defendant sees one such vital element as knowledge relating to the interstate character of the securities. The instruction with which defendant finds fault read:

Count 1 of the indictment No. 71 CR 509 charges the crime of conspiracy to commit the offense of transporting into interstate commerce falsely made and forged securities, knowing the securities to have been falsely made and forged.

To convict the defendant Waverly Thompson of this offense, the government must prove beyond a reasonable doubt the existence of a conspiracy to commit the offense of transporting into interstate commerce falsely made and forged securities, knowing the securities to have been falsely made and forged.

Defendant's interpretation of this instruction strikes us as somewhat strained but we have considered it with great care. Defendant argues that this instruction allowed a conviction on the finding that defendant knew only that the securities were falsely made and forged. Although no objection was stated at the time, defendant asserts a right to raise this point on appeal on the ground that the alleged error is so fundamental, touching the Trial Court's responsibility for instructing the jury upon the essential elements of the offense on which defendant was being tried. Defendant cites Screws v. United States, 1945, 325 U.S. 91, 107, 65 S.Ct. 1031, 89 L.Ed. 1495 and other cases to support his raising objection to the instruction at this late date.

In urging that we consider knowledge of interstate transportation to be an es-

sential ingredient of the offense, defendant cites a number of Second Circuit decisions including United States v. Giuliano, 1965, 348 F.2d 217, 221; United States v. Vilhotti, 1971, 452 F.2d 1186, 1189, 1190 (where the Court drew a distinction between the substantive offense for which knowledge of interstate commerce need not be charged and conspiracy to commit the offense.) The Court quotes Judge Learned Hand in United States v. Crimmins, 2 Cir., 1941, 123 F.2d 271, 273, that one may drive past a traffic light of whose existence he is ignorant, but not conspire to drive past a light unless one knows it is there. We do not find this line of reasoning particularly apt with respect to the statutes here involved.

Defendant also cites United States v. Bollenbach, 1945, 147 F.2d 199, 201, 2 Cir., rvsd. 1946, 326 U.S. 607, 609, 66 S.Ct. 402, 404, 90 L.Ed. 350. The erroneous charge in that case read:

. . . possession of stolen property in another state than that in which it was stolen shortly after the theft raises a presumption that the possessor was the thief and transported stolen properly in interstate commerce. . .

We are not here dealing with presumptions.

The Second Circuit position is again stated in the recent case of United States v. Fields, 1972, 466 F.2d 119, 121, which defendant has brought to our attention as additional authority.

The Ninth Circuit, however, holds to the contrary. In United States v. Roselli, 1970, 432 F.2d 879, 890–891, cert. den. 1971, 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828, the Court expressly held that knowing use of interstate facilities was not an essential element of either the substantive offense or the conspiracy to violate § 2314. The Ninth Circuit found nothing in the legislative history indicating a purpose to limit the statute to violators who specifically intended to utilize interstate facilities and felt that the natural import of the statute's wording was to the contrary, that

§ 2314 was aimed at the evils of theft, fraud and counterfeiting and that suppression of movement of the fruits of these crimes was the means not so much of regulating interstate commerce as of suppressing the crimes within a constitutional exercise of federal power.

We find extremely persuasive the reasoning of the Ninth Circuit (432 F.2d at page 892) that proof of knowledge of the federal jurisdictional element is not required for conviction of the offense. As an example, the Court uses the first paragraph of § 2314, which requires as a jurisdictional element of the offense that the value of the securities exceed $5,000, and points out that it would be no defense that the accused mistakenly thought the securities were worth only $2,000.

This Court affirmed the convictions of violating § 1951 (the Hobbs Act) where it was contended that the evidence was insufficient in that it failed to show defendant's intention or even knowledge that interstate commerce would be affected by the conspiracy. United States v. Battaglia, 7 Cir., 1968, 394 F.2d 304, 312, vacated and remanded on other grounds, sub nom. Giordano v. United States, 1969, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (ultimately affirmed again 432 F.2d 1115, cert. den. 401 U.S. 924, 91 S.Ct. 868, 27 L.Ed.2d 828) where Judge Cummings cited with approval this Court's earlier decision in United States v. Pranno, 1967, 385 F.2d 387, cert. den. 390 U.S. 944, 88 S.Ct. 1028, 19 L.Ed.2d 1132, that it was necessary only to prove that defendants conspired to commit extortion and that the natural effect of carrying out their threat, whether they were conscious of it or not, would affect commerce.

We affirmed the conviction in United States v. Cerone, 1971, 452 F.2d 274, cert. den. 405 U.S. 964, 92 S.Ct. 1168, 31 L.Ed.2d 240, in the face of a similar challenge respecting Title 18 U.S.C. § 1952, use of interstate facilities to further unlawful gambling, on the ground that ample proof had been ad-

duced of defendant's knowledge that interstate facilities would be used. In *Cerone*, we expressly reserved the decision whether to adopt the Ninth Circuit view. We need not make that decision in this case either. We fully agree with the government that use of interstate facilities under the particular facts of this case was so vital a factor in the defendants' scheme that if the jury did not believe defendant was aware of that fact, the jury could not possibly have found him guilty. Even assuming that defendant's interpretation of the instruction is correct, it could not have led the jury into believing that it could convict this defendant, in the circumstances of this case, without deciding that he was well aware of the necessary use of interstate facilities.

■ Defendant sees prejudicial results from the Trial Judge's instruction to weigh with great care the testimony of accomplices, wherein he told the jury that George Wright, Ionia Coleman and Dayo Nagel were accomplices; thus, defendant contends, the Court virtually directed a verdict of guilty instead of allowing the jury to decide whether defendant was an aider and abettor of those three as charged in the indictment.

We agree that the better description of the three witnesses would have been as "alleged accomplices," but, as in United States v. Fellabaum, 7 Cir., 1969, 408 F.2d 220, 227, cert. den. sub nom. Pyne v. United States, 396 U.S. 818, 90 S.Ct. 55, 24 L.Ed.2d 69 and United States v. Pritchard, 7 Cir., 1972, 458 F.2d 1036, 1040, cert. den. 407 U.S. 911, 92 S.Ct. 2434, 32 L.Ed.2d 685 we find this instruction harmless error in the circumstances of this case. The jury cannot have failed to discern that the purpose of the instruction was to alert it to the need for caution in weighing the testimony, all to the benefit of the defendant.

As the government notes, this was not a weak case. In addition to the testimony of the three named witnesses, there was a stipulation that defendant had de-posited in his own account a check drawn on Dakota National Bank, signed, "Nagel Grain and Seed Company, Dayo D. Nagel," and that calls were placed between October 9, 1970 and February 3, 1971, to telephones registered to Dayo Nagel and the Bismarck Motor Hotel from a telephone registered to defendant. The various canceled checks and their endorsements were put in evidence. A contract for rental of an automobile signed December 17, 1970, imprinted with a credit card number registered to defendant, showed mileage which also served to substantiate some of the testimony of Messrs. Nagel and Wright.

In United States v. Balodimas, 7 Cir., 1949, 177 F.2d 485, 487, on which defendant relies, the alleged accomplices were neither co-defendants nor unindicted co-conspirators. The judgment was reversed because this Court found "not justified by the record" the Trial Judge's instruction to the jury that the witnesses had openly admitted being violators and taking part in the commission of the crime.

■ Defendant sees as error the admission of statements which he characterizes as "post-conspiracy declarations of other co-defendants." Both George Wright and Dayo Nagel testified to a conversation which one placed late in January 1971 and the other early in February 1971. Mr. Nagel had been arrested, as indicated, on a State charge which he described as "with intent to defraud the Dakota National Bank of Bismarck" which apparently grew out of an insufficiency of funds in the Apex account to cover the forged Apex checks. He had come to Chicago in an attempt to secure funds to exonerate himself on the State charge after defendant had promised to help him. We cannot agree that Mr. Nagel's arrest on the State charge terminated the conspiracy charged in the federal indictment.

Mr. Wright testified, over objection of defendant, that at the conversation in question, Mr. Nagel explained that if he could recover the $27,000 to $29,000 he

had previously delivered he could put it back into his account, and Mr. Wright had denied all knowledge of that sum. Mr. Nagel himself testified, also over objection, that George Wright said he had not received his share of the $17,000. As indicated, there had been earlier testimony that $10,000 had been delivered to Mr. Wright in Bismarck. Mr. Nagel had replied that he was not interested in that, but that he wanted the money back. Thus each of these witnesses testified to the fact of his own statement, as well as to the statement of the other, and both were present in court and available for cross-examination. These statements were thus mere repetition of earlier testimony that Mr. Nagel gave Mr. Wright $10,000 and defendant $16,700. We fail to see any prejudicial effect. The statements, in our opinion, concerned events occurring clearly within the course of the conspiracy.

■ In defendant's view, his sentence was unduly harsh. He compares it with the lenience shown his co-defendants who were all granted probation for three years, with Counts 2 to 8 of the indictment being dismissed as to Dayo Nagel. He notes that George Wright had a record of two prior convictions for burglary. Defendant sees only one possible explanation: that he has been penalized for exercising his Constitutional right to trial by jury.

The record discloses that defendant was formerly a policeman in Chicago. The Trial Judge specifically indicated that defendant seemed to have secured most of the money from this operation. The testimony shows that defendant was the principal director of the actions taken. It was he who established the outlet for the checks. He supplied the name and address of the payee. He showed George Wright how to make out the checks. He directed him to go to North Dakota, made the arrangements for the car and issued the telephone instructions to Mr. Nagel in North Dakota. He did secure most of the spoils and did so at the expense of his fellow conspirators contrary to their original agreement.

Defendant was convicted of violations of Title 18 U.S.C. §§ 371 and 2314. The maximum imprisonment under § 371 is five years and under § 2314, ten years. A sentence of five years on each count to run concurrently is well within the limits of the statute.

■ A show of lenience to those who exhibit contrition by admitting guilt does not carry a corollary that the Judge indulges a policy of penalizing those who elect to stand trial. United States v. Lehman, 7 Cir., 1972, 468 F.2d 93, 110.

The Judgment of the District Court is affirmed.

Affirmed.