**UNITED STATES of America, Appellee,**

v.

**Eric PARKER, Gary Phillips, and Keith Moon, Defendants–Appellants.**

Nos. 652, 694, 674, Dockets 89–1390, 89–1391, 89–1402.

United States Court of Appeals, Second Circuit.

Argued Jan. 30, 1990.

Decided May 7, 1990.

Deirdre M. Daly, Asst. U.S. Atty., New York City (Otto G. Obermaier, U.S. Atty. for the Southern District of New York, Kerri Martin Bartlett, Asst. U.S. Atty., New York City, on the brief), for appellee.

Mitchell A. Golub, New York City (Golub & Dunn, New York City, on the brief), for defendant-appellant Eric Parker.

Howard L. Jacobs, New York City, for defendant-appellant Gary Phillips.

Jonathan H. Rosenbluth, South Orange, N.J., for defendant-appellant Keith Moon.

Before OAKES, Chief Judge, KEARSE and FLETCHER *, Circuit Judges.

KEARSE, Circuit Judge:

Defendants Eric Parker and Keith Moon appeal from judgments entered in the United States District Court for the Southern District of New York, following a jury trial before Charles S. Haight, Jr., *Judge,* convicting them of conspiracy to commit interstate robbery, in violation of 18 U.S.C. § 1951 (1988); commission of interstate robbery, in violation of 18 U.S.C. §§ 1951 and 2 (1988); interstate transportation of stolen property, in violation of 18 U.S.C. §§ 2314 and 2 (1988); receipt of stolen property, in violation of 18 U.S.C. §§ 2315 and 2 (1988); and use of firearms during a crime of violence, in violation of 18 U.S.C. §§ 924(c) and 2 (1988). Defendant Gary Phillips appeals from a judgment entered in the United States District Court for the Southern District of New York, following a jury trial before Lloyd F. MacMahon,

---

* Honorable Betty B. Fletcher, United States Court of Appeals for the Ninth Circuit, sitting by desig- nation.

*Judge,* convicting him of the same offenses. With respect to the conspiracy, robbery, transportation, and receipt-of-stolen-property offenses, Parker, Moon, and Phillips were sentenced principally to four concurrent prison terms of 78 months, 121 months, and 63 months, respectively; each of these prison terms was to be followed by a 60–month prison term on the firearms count, and a three-year term of supervised release. On appeal, each defendant contends principally that he was denied a fair trial by statements made by the Assistant United States Attorney in summation. Parker and Moon also challenge, *inter alia,* the sufficiency of the evidence to support their convictions and the district court's calculation of their sentences. For the reasons below, we affirm the judgments of conviction.

## I. BACKGROUND

The present prosecution arises out of a May 13, 1988 robbery of a check-cashing firm, during which two guards were shot. The government's trial evidence was presented principally through the testimony of codefendant Jeffrey Smith, who had pleaded guilty and entered into a cooperation agreement with the government, law enforcement officers who by happenstance intercepted one of the fleeing robbers, and other eyewitnesses. Taken in the light most favorable to the government, the trial evidence established the following events.

### A. *The Events*

In the winter of 1986, Parker and Moon began working as armed guards at the Payroll Express Corporation ("Payroll") in Elizabeth, New Jersey. Payroll was a check-cashing firm that delivered large amounts of cash to corporate clients, including American Telephone and Telegraph ("AT&T") in New York City. Parker remained employed at Payroll until May 13, 1988; Moon ceased to work there in March 1988.

On May 11, 1988, Moon met in Irvington, New Jersey, with Phillips and Smith, whom he and Parker had known since their high-school days in Irvington, and with several other individuals, including Gregory Wayne King, Eric Andre Higgs, and Wayne Hickson. Phillips told Smith they needed a "lookout" and that Moon would explain why. Moon told Smith they needed him to stand on a street corner and watch for police. Without learning any details at that point, Smith agreed. Moon then led an exploratory expedition to New York, ending near the AT&T building at 33 Thomas Street.

The events during which Smith was to serve as a lookout were outlined by Moon on May 11 and 12 as follows. On the morning of May 13, Parker would call Moon and give him the description of the Payroll car that would deliver cash to the AT&T building and the car's estimated time of arrival. Moon would relay the description to the other members of his group who would call Moon from a pay telephone near Thomas Street. When the Payroll car arrived at 33 Thomas Street, Phillips would deliberately stall his car in a position to prevent other cars from entering that block. Other members of Moon's group would ambush the Payroll car, get the occupants out, and drive the car a few blocks to Leonard Street, where King's car would be parked. There they would transfer the cash from the Payroll car to King's car, return to Moon's home in New Jersey, and divide up the money.

Early on May 13, Parker reported for work at Payroll. He asked cashier Lori Hochron whether she was assigned to go to the AT&T building; she confirmed that she was, and Parker learned what her delivery schedule was by grabbing the "run-sheet" from her hands. Parker began his own delivery route at about 6:15 a.m.; some six blocks away from the Payroll offices, however, Parker stopped his car, contrary to company rules, and made a call from a pay telephone. Calls from pay telephones were not traceable. Parker told the Payroll employees with him that he had made a wake-up call to his sister. At about 7:30 a.m., Parker made another call, this one from a Payroll client's office; this call was traced to Moon.

In the meantime, at approximately 5:00 a.m., Phillips, Smith, Higgs, King, and Hickson had left Irvington for New York in two cars. One was King's car; the other was a car that had been rented the day before by Parker's girlfriend at Parker's request and driven from the rental agency by Moon. They proceeded largely in accordance with Moon's plan, parking King's car on Leonard Street, telephoning Moon to get Parker's information as to the description and schedule of the Payroll car, and taking up their strategic positions near the AT&T building.

When the Payroll car arrived at the AT&T building, Phillips blocked access to that block with the rented car, Smith took up a lookout position, and Higgs, King, and Hickson ambushed the Payroll car. The two Payroll guards who got out of the car were shot; the two other employees in the car were pulled out. Higgs and King drove the Payroll car to Leonard Street where they transferred most of the money, some $247,000, to King's car. Higgs and King then drove King's car back to New Jersey.

After the robbery, Phillips abandoned the rented car and returned to New Jersey by train. Separately, Smith also returned to New Jersey by train. Phillips and Moon later retrieved the rented car and returned it to the rental agency.

Hickson, a member of the ambush squad, did not get into the Payroll car, and he attempted to flee the robbery scene on foot. As luck would have it, however, he encountered two agents of the Federal Bureau of Investigation ("FBI") who were arriving at their offices nearby and who chased and arrested him. Within 48 hours, Parker, Moon, and Phillips also were arrested. Smith turned himself in several days later.

None of the defendants testified at trial. Parker sought to present innocent explanations for the actions attributed to him. To explain his car rental, he called as a witness an automobile mechanic who testified that Parker's car was in need of repair.

### B. *The Verdicts*

Parker, Moon, Phillips, and Smith, *et al.*, were indicted on the conspiracy, robbery, and robbery-related charges indicated above. Parker, Moon, and Phillips were tried together. The jury, after deliberating for five days, found Parker and Moon guilty on all counts but was unable to reach a verdict as to Phillips. Phillips was retried and found guilty on all counts. These three defendants were sentenced as indicated above.

## II. DISCUSSION

On appeal, Parker and Moon contend that the evidence was insufficient to support their convictions. They also challenge, *inter alia*, the prosecutor's summations and the sentences imposed on them. Phillips challenges only the prosecutor's summation at his second trial. We have considered all of their arguments on appeal and find no basis for reversal.

### A. *Sufficiency of the Evidence*

Parker and Moon challenge the sufficiency of the evidence to support their convictions largely on the grounds that (1) the principal evidence against them was testimony of Smith, who admitted having lied in various respects in the past, and that (2) since they were not present at the robbery, the remaining evidence against them was circumstantial. Their contentions have no merit.

■ In reviewing a challenge to the sufficiency of the evidence, we are required to credit every inference that could have been drawn in the government's favor, *United States v. Bagaric*, 706 F.2d 42, 64 (2d Cir.), *cert. denied*, 464 U.S. 840, 104 S.Ct. 134, 78 L.Ed.2d 128 (1983); *United States v. Carson*, 702 F.2d 351, 361 (2d Cir.), *cert. denied*, 462 U.S. 1108, 103 S.Ct. 2456, 2457, 77 L.Ed.2d 1335 (1983), and to affirm the conviction so long as, from the inferences reasonably drawn, the jury might fairly have concluded guilt beyond a reasonable doubt, *United States v. Buck*, 804 F.2d 239, 242 (2d Cir.1986); *United States v. Taylor*, 464 F.2d 240, 244–45 (2d Cir.1972). These principles apply whether the evi-

dence being reviewed is direct or circumstantial. *See Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

 The fact that a conviction may be supported only by the uncorroborated testimony of a single accomplice is not a basis for reversal if that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt. *United States v. Bernstein*, 533 F.2d 775, 791 (2d Cir.), *cert. denied*, 429 U.S. 998, 97 S.Ct. 523, 50 L.Ed.2d 608 (1976). Any lack of corroboration goes merely to the weight of the evidence, not to its sufficiency. *See, e.g., United States v. Roman*, 870 F.2d 65, 71 (2d Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 3164, 104 L.Ed.2d 1026 (1989). Whether or not there is corroboration for an accomplice's testimony, the weight of the evidence is a matter for argument to the jury, not a ground for reversal on appeal, *see id.*, and we must defer to the jury's assessments of both the weight of the evidence and the credibility of the witnesses, *United States v. Stratton*, 779 F.2d 820, 828 (2d Cir.1985), *cert. denied*, 476 U.S. 1162, 106 S.Ct. 2285, 90 L.Ed.2d 726 (1986); *United States v. LeRoy*, 687 F.2d 610, 616 (2d Cir.1982), *cert. denied*, 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983).

 The evidence here was ample to support the convictions of Parker and Moon. Though Smith was attacked on cross-examination with respect to various past untruths, his description of the events, including Moon's orchestration of the robbery and the role Moon said Parker was to play, was not incredible on its face. Even had Smith's testimony been the only evidence against Parker and Moon, we would not be entitled to overturn the jury's verdict against them.

In addition, Smith's description of Parker's role was complemented by other evidence of Moon's participation and of unusual behavior by Parker. For example, Parker's girlfriend testified that the car she rented for Parker was driven from the rental agency by Moon. Further, she stated that she had never before rented a car

for Parker. And though Parker's claimed reason for renting the car on May 12 was to allow his own car to be repaired, he drove his car to work on May 13, while the rented car was used in the robbery. In addition, Hochron testified that Parker had never before asked her whether she would be going to a given destination, had never asked her what stops she would be making during the day, and had never before taken her run-sheet. Finally, the jury was entitled to infer that Parker's first call on May 13, after learning what car would be making the delivery to the AT&T building at what time, was to Moon to give him that information, and that his 7:30 a.m. call to Moon was to learn the outcome of the operation.

We conclude that the challenges to the sufficiency of the evidence are meritless.

**B. *The Prosecutor's Summations***

Each of the appellants contends that he was denied a fair trial because of certain statements by the prosecutor during summation. We conclude that the contentions of Moon and Phillips have no merit. Though the statement challenged by Parker gives us pause, we conclude that it is not ground for reversal.

**1. *Parker***

In an effort to provide innocent explanations for his actions, Parker argued that his first telephone call on the morning of May 13, shortly after he learned the schedule of the car going to the AT&T building and began his own route, was in fact merely a wake-up call to his sister. A Payroll employee who rode with Parker on May 13 testified that Parker had said that call was to his sister. An FBI agent also testified that in a postarrest interview Parker said that call was to his sister.

In urging the jury to reject this explanation, the prosecutor pointed out in her initial summation, over objection, that Parker had failed to call his sister as a witness at trial to corroborate his story. After noting that Parker had "no duty, no obligation to call anyone to testify at this trial," the

prosecutor pointed out that Parker had in fact called one witness and she argued as follows:

The burden rests entirely on the government to prove Eric Parker's guilt, and to prove it beyond a reasonable doubt, but I ask you, ladies and gentlemen, since Eric Parker decided to call witnesses, why didn't he call his sister to say on the morning of the robbery he called me.

What's the answer to that question, ladies and gentlemen—

MR. GOLUB [Parker's attorney]: Judge, I have an objection.

THE COURT: I think what counsel has said is permissible, I'll permit the argument.

MS. DALY [Assistant United States Attorney]: Thank you, your Honor.

Why didn't he call his sister? He didn't call his sister to the stand, ladies and gentlemen, because he didn't call his sister on the morning of May 13th. He called Kieth [sic] Moon, just as the plan was to call Kieth [sic] Moon after he found out the information so that the robbery would go off smoothly.

Parker contends that this summation deprived him of a fair trial in part because it suggested to the jury that he had some obligation to call his sister as a witness. In addition, he points out that investigators had interviewed his sister, who told them that Parker had telephoned her at about 6:30 a.m. on May 13. Thus, he argues that the summation was in bad faith. Though these arguments give ground for concern, we are not persuaded that they warrant reversal.

■■■ A prosecutor who wishes to argue in summation that the government's evidence has been largely uncontradicted must walk a fine line. On the one hand, she is "entitled to comment on a defendant's failure to call witnesses to contradict the factual character of the government's case, ... as well as his failure to support his own factual theories with witnesses." *United States v. Bubar*, 567 F.2d 192, 199 (2d Cir.), *cert. denied*, 434 U.S. 872, 98 S.Ct. 217, 54 L.Ed.2d 151 (1977). On the other hand, she must avoid commenting in a way that trenches on the defendant's constitutional rights and privileges. For example, she may not permissibly comment on the failure of the defendant to testify, *see id.; United States v. Gotchis*, 803 F.2d 74, 81 (2d Cir.1986), or invite the jury to "presume" in the absence of countervailing evidence that the government's view of the case is correct, *see id.* at 80–81, or suggest that the defendant has any burden of proof or any obligation to adduce any evidence whatever, *see, e.g., United States v. Walker*, 835 F.2d 983, 988–89 (2d Cir.1987); *United States v. Cruz*, 797 F.2d 90, 93 n. 1 (2d Cir.1986); *see also United States v. Pena*, 793 F.2d 486, 491 (2d Cir.1986) (improper for prosecutor to comment on defendant's motive in entering into factual stipulation).

■■■ In order to obtain reversal of a conviction on the ground that the prosecutor has crossed the boundary between permissible and impermissible argument, a defendant must show that the improper argument caused him substantial prejudice. *See, e.g., United States v. Walker*, 835 F.2d at 988; *United States v. Nersesian*, 824 F.2d 1294, 1327 (2d Cir.), *cert. denied*, 484 U.S. 958, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987); *United States v. Cruz*, 797 F.2d at 93 n. 1. In determining whether the defendant has suffered such prejudice, we consider the seriousness of the misconduct, the measures adopted by the trial court to cure the misconduct, and the certainty of conviction absent the improper statements. *See, e.g., United States v. Walker*, 835 F.2d at 988; *United States v. Nersesian*, 824 F.2d at 1329; *United States v. Modica*, 663 F.2d 1173, 1181 (2d Cir.1981) (per curiam), *cert. denied*, 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982). Even where the prosecutor's argument was clearly impermissible, we have been reluctant to reverse where the transgression was isolated, the trial court took swift and clear steps to correct the implication of the argument, and the evidence against the defendant was strong. *See, e.g., United States v. Cruz*, 797 F.2d at 93 n. 1 (in light of the record, the argument as a whole, and the curative

instructions, prosecutor's improper statement that "[t]he defense ... has to convince you" was not ground for reversal).

■■■] We are unable to conclude that the part of the summation challenged by Parker calls for reversal. While the form of the argument, *i.e.*, repeated questions as to why Parker had not summoned his sister to testify, may well have suggested to the jury that Parker had failed to fulfill some obligation, the prosecutor had begun this portion of the argument by stating that Parker had no obligation to call any witness and that the burden rested solely on the government to prove his guilt beyond a reasonable doubt. We consider the possible implication of the argument as a whole to be far less serious than the statement in *Cruz* that the defendant had the burden of persuasion.

Further, following this summation, Judge Haight, at Parker's request, instructed the jury that no defendant is under any obligation to put in any evidence, to pursue or initiate any particular line of inquiry, or to call any particular witness. He instructed the jury "not to speculate as to why a particular defendant did or did not call a particular potential witness." During its general instructions to the jury, the court twice repeated the substance of this cautionary instruction.

Finally, we note that the other evidence against Parker, including his unprecedented inquiries of Hochron on the morning of May 13 with respect to the delivery to the AT&T building, his rental of the car used to block the pertinent intersection during the robbery, the permissible inference that his first call that morning was to Moon, and his proven 7:30 a.m. call to Moon, made it highly probable that the jury would have convicted Parker without reference to his failure to summon his sister as a witness.

■■■ We also reject Parker's contention that the summation argument was in bad faith because prior to trial his sister had told the government that Parker called her. Though the government concedes that the sister made this unsworn statement in an interview, it was not required to credit her

statement or to believe that she would have repeated it under oath.

We conclude that the summation is not ground for reversal of Parker's conviction.

### 2. *Moon*

■■■ In the robbery, both Payroll guards were shot and seriously injured. One, Hiram McMillion, recovered sufficiently to testify at trial; the other, Joshua Boyd, remained in a coma. In order to minimize the jury's attention to the injuries suffered in the robbery, the parties entered into a stipulation, which was read to the jury, stating that Boyd would not testify for medical reasons. Moon contends that the prosecutor, in her rebuttal summation, injected the prejudicial suggestion that Boyd had died from his wounds. The background of this argument is as follows.

When the police arrived at the robbery scene, they directed that everyone who had nothing to do with the robbery move back. Candace Kwong, one of the Payroll cashiers who had been in the car, said, "I have something to do with it, I know everyone involved, it was my fault." Defendants sought to emphasize this statement at the first trial, attempting to show that Kwong, not Parker, was the robbers' contact inside Payroll. In her rebuttal summation, the prosecutor sought to explain Kwong's statement, arguing that

> Kwong was a victim in this case. She was a witness of the shooting of Hiram McMillion, a man she worked with, a man she cared about. She was hysterical after the shooting. The eyewitnesses that saw her all testified to that....

> She didn't remember being questioned by the police. Police Officer Hunt testified that she was and that she said, "I'm involved, I knew everyone, it was my fault." What did she mean, ladies and gentlemen? The government suggests that what she meant is she was involved, she was a victim of the crime. She did know everyone involved. She knew the people that were there, the people that were lying in the street. The robbers

weren't there. She knew the victims. It was her fault.

What does she mean when she says it was her fault? She had just seen a man, two men, get gunned down. She felt a tremendous amount of guilt. I'm fine, they are lying on the street. She didn't know that Hiram McMillion would luckily survive.

Defendants immediately objected to this statement and, when the court later entertained argument, moved for a mistrial. They argued that by stating that McMillion survived, the prosecutor improperly suggested that Boyd had not.

Judge Haight denied the motion, viewing defendants' argument as

farfetched. Kwong testified that after the robbery she sat with McMillion as he lay wounded on the street for ten minutes waiting for an ambulance.... The government's attorney acted reasonably when she called the jury's attention to Kwong's concern for McMillion. There is no reason to believe the prosecutor's comments were calculated to call attention to Boyd's condition, or that they even did so. If her comments could be taken as saying anything about Boyd's medical condition, they were ambiguous in that regard, especially in light of the parties' stipulation which clearly said he was simply unavailable for unspecified medical reasons, a clear indication Boyd was *not* dead.

Memorandum Opinion and Order dated March 7, 1989, at 17–18 (emphasis in original).

We affirm substantially for the reasons stated in Judge Haight's opinion. There is no suggestion, either in the trial record or in the arguments on appeal, that the prosecutor used a tone that emphasized McMillion's name; in the absence of any such emphasis, the stipulation that Boyd was unable to testify for medical reasons made it unlikely that the jury would infer that Boyd was dead. Further, to correct any possible misimpression, defendants could simply have asked the court to inform the jury that both guards had survived; there

is no indication in the record that they requested such an instruction.

The district court was in the best position to assess the effect of the challenged statement on the jury. We see no basis in the record to overturn its determination that the prosecutor's statement was not likely to be misunderstood and did not warrant a mistrial.

### 3. *Phillips*

■ At both the original trial and the subsequent trial of Phillips alone, the government relied to a great extent on the testimony of Smith for proof of the planning and execution of the robbery. At both trials, Smith's credibility was fiercely attacked, as it was brought out, *inter alia,* that Smith had a history of drug abuse and that he had made a number of false statements to the authorities in the early stages of the investigation. Phillips contends that at the second trial, the prosecutor improperly vouched for Smith's testimony by telling the jury that Jeffrey Smith "told you the truth." We find no basis for reversal.

It is, of course, improper for the prosecution to vouch for the honesty of a witness. *See, e.g., United States v. Young,* 470 U.S. 1, 8, 105 S.Ct. 1038, 1042, 84 L.Ed.2d 1 (1985); *United States v. Johnson,* 331 F.2d 281, 282 (2d Cir.) (per curiam), *cert. denied,* 379 U.S. 905, 85 S.Ct. 196, 13 L.Ed.2d 178 (1964). The statement challenged by Phillips, however, viewed in context, was far more limited than he suggests.

The prosecutor noted that Phillips had cross-examined Smith at length and had been unable to shake his testimony. She suggested that the testimony had not changed because it was the truth, continuing as follows:

The government did not call Jeffrey Smith because he is a pillar of the community. The government called Jeffrey Smith because he is a friend of Gary Phillips. And he knew about this robbery. Jeffrey Smith got on the stand. He didn't pose as anyone he is not. He said: "I have used drugs. I have sold drugs. I'm involved in this robbery." He told you the truth.

After Judge MacMahon overruled Phillips's objection, the prosecutor continued, inviting the jury to review Smith's cooperation agreement and to reason that that agreement gave Smith a motive to tell the truth in preference to lying; asking the jury to view Smith's testimony in light of the evidence that corroborated it, to wit, eyewitness testimony and postarrest statements by Phillips himself; and urging the jury to evaluate Smith's testimony in light of its internal logic and in light of the jury's own common sense.

While the prosecutor should avoid statements such as "[the government's witness] told the truth," the record here reveals that the challenged statement was made in the context of an argument simply that Smith had acknowledged that he was not a model citizen. We conclude that, as a whole, the summation did not urge that the jury should accept Smith's testimony because the government believed it.

### C. Criticisms of the Jury's Deliberations

Moon makes two other challenges to the verdict against him. He contends, first, that communications from the jury to the court during deliberations showed that the jury was so confused that a mistrial should have been declared. In addition, he contends that the jury improperly considered medical testimony concerning Boyd's wounds. For the reasons below, we reject both contentions.

On the third day of deliberations, the jury sent the court a note asking, "Can the jury be undecided on one defendant's guilt or innocence?" Upon inquiry by Judge Haight, the jury indicated that it had reached a unanimous verdict as to at least one of the defendants, but that it could not reach a unanimous verdict as to one particular, but unidentified, defendant. Over objection by Parker, the trial judge gave the jurors a modified Allen charge, see Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

On the fifth day of deliberations, the court received a note signed by one juror, Vic Ortiz, complaining that "[t]he system" was not working. Shortly thereafter, an unidentified juror sent out a note requesting that the trial judge "speak to all 12 jurors on split verdicts." After consulting with counsel, Judge Haight instructed the jury that it should attempt to reach unanimous verdicts as to each defendant on each count, but that if that were not possible, the jury could return partial verdicts.

Later that morning, Ortiz and another juror sent the court notes asking to be excused from the jury. Ortiz's note stated:

> I wish to be disqualified from this trial because certain jurors are confused as to their duties & obligations as jurors and[ ] they're unable to make sense of what is going on; what has transpired during this trial and they're incapable of understanding the Judge's Instructions which have been given to us in plain English.

(Emphasis in original.) Following these notes, defendants moved unsuccessfully for a mistrial. After consulting with counsel, Judge Haight concluded that no cause had been shown for excusing the jurors. He instructed the jury again that it was permissible to reach verdicts as to some defendants and not others, so long as the verdict as to any defendant on a given count was unanimous. We find no error in the court's procedure.

▇▇▇▇▇ It is the responsibility of the trial judge to provide the jury with sufficient instruction to enable it to assess the evidence within the proper legal framework and to reach a rational verdict. The trial judge is in the best position to sense whether the jury is able to proceed properly with its deliberations, and he has considerable discretion in determining how to respond to communications indicating that the jury is experiencing confusion. See, e.g., United States v. Read, 658 F.2d 1225, 1241–42 (7th Cir.1981). Communications indicating an individual juror's disagreement with his fellow jurors and his frustration with the deliberation process neither require that a mistrial be ordered, see id., nor require that the juror be excused, cf. United States v. Casamento, 887 F.2d 1141, 1187 (2d Cir. 1989) (court had discretion whether or not to excuse juror whose daughter had received threatening message), cert. denied,

— U.S. ——, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990). Rather, the court has discretion to respond to jury communications, preferably after consultation with counsel, with supplemental instructions designed to remedy the confusion. *See, e.g., United States v. Civelli*, 883 F.2d 191, 193–94 (2d Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 409, 107 L.Ed.2d 374 (1989).

 We see no flaw in the court's handling of the juror communications in the present case. The communications from individual jurors did not indicate that their authors were incapable of understanding the evidence or the court's instructions or that they were in any other respect incapable of carrying out their responsibilities as jurors. Nor does the record provide any sound basis for inferring that any of the other jurors was incapable of rationally evaluating the evidence or following the court's instructions. The court was well within the bounds of discretion in denying defendants' motion and giving clarifying instructions.

 Nor is there any merit in Moon's suggestion that the jury's request to rehear medical evidence demonstrates improper consideration of such evidence. The evidence requested by the jury had been admitted without objection; indeed, Moon does not argue even here that the evidence was inadmissible. It was within the discretion of the court to permit the requested testimony to be reread to the jury. *See United States v. Damsky*, 740 F.2d 134, 138 (2d Cir.), *cert. denied*, 469 U.S. 918, 105 S.Ct. 298, 83 L.Ed.2d 233 (1984).

## D. *The Motion for a New Trial Based On Newly Discovered Evidence*

Following the first trial, Parker and Moon moved pursuant to Fed.R.Crim.P. 33 for a new trial on the ground that newly discovered evidence would exculpate them. In support of their motions, they presented statements by one Dwayne Williams, an inmate at the Metropolitan Correctional Center ("MCC"), that Higgs, while at MCC awaiting trial, had told Williams that Parker and Moon had nothing to do with the robbery and that Smith had lied about their involvement in order to conceal the fact that Smith's role had been that of gunman, not merely lookout.

Prior to sentencing Higgs, who had pleaded guilty on the morning of the first day of trial, Judge Haight allowed defense counsel to interview Higgs twice with respect to these allegations. Higgs denied making the statements attributed to him and said he had nothing to say that would exculpate Parker or Moon. Defense counsel, arguing that the prospect of sentencing might be inhibiting Higgs's willingness to speak freely, urged the court to proceed with Higgs's sentencing and then allow them to interview him a third time. The court sentenced Higgs the same day. After he was sentenced, however, Higgs told the court that he had already told defense counsel all he knew and that he did not wish to be interviewed further.

Judge Haight refused to order Higgs to submit to further interviews and denied the motions for a new trial. He found that the statements of Williams would be hearsay and would not be admissible at trial since they did not fall within the exception in Fed.R.Evid. 804(b)(3) for statements against the penal interest of an unavailable witness. He also concluded that given the extent to which defendants already had impeached the testimony of Smith with evidence of his history of, *inter alia*, drug abuse, drug dealing, and prevarication, there was little likelihood that the statements attributed to Higgs would lead the jury to find Parker and Moon not guilty. Memorandum Opinion and Order dated September 5, 1989, at 7–10. We agree.

 In order to obtain a new trial on the ground of newly discovered evidence, the moving defendant must show, *inter alia*, that the new evidence would "probably lead to an acquittal." *United States v. Alessi*, 638 F.2d 466, 479 (2d Cir.1980); *see United States v. Stofsky*, 527 F.2d 237, 243 (2d Cir.1975) (new evidence generally does not entitle defendant to a new trial unless it is likely to produce a different verdict), *cert. denied*, 429 U.S. 819, 97 S.Ct. 65, 50 L.Ed.2d 80 (1976). This principle presup-

poses, of course, that the proffered new "evidence" would be admissible at the new trial. *See United States v. Mackin,* 561 F.2d 958, 962–63 (D.C.Cir.), *cert. denied,* 434 U.S. 959, 98 S.Ct. 490, 54 L.Ed.2d 319 (1977).

■ Consideration of a motion for a new trial is committed to the sound discretion of the district court, and we will not overturn the denial of such a motion in the absence of an abuse of discretion. *See United States v. Zane,* 507 F.2d 346, 347–48 (2d Cir.1974), *cert. denied,* 421 U.S. 910, 95 S.Ct. 1563, 43 L.Ed.2d 775 (1975). We find no such abuse here.

■ Rule 804(b)(3) provides, in pertinent part, that the hearsay statement of an unavailable witness may be admitted if it is

[a] statement which was at the time of its making ... so far tended to subject the declarant to civil or criminal liability ... that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Fed.R.Evid. 804(b)(3). As Judge Haight found, Williams's statements as to what Higgs said to him would not have been admissible under this Rule. Even if Higgs were unavailable to testify, and the court found he was not, the statements attributed to him did not tend to subject him to further criminal liability with respect to the robbery; they merely shifted the blame among his codefendants.

Nor did defendants advert to any corroborating circumstances to indicate that the statements attributed to Higgs were trustworthy. Indeed, the sequence of events strongly tended to contradict any suggestion that Smith had fabricated the involvement of Parker and Moon, for Parker and Moon were arrested before the authorities had any contact with Smith.

In all the circumstances, we find no abuse of discretion in the court's denial of the motions for a new trial.

### E. Challenges to the Sentences

■ Parker and Moon contend that the district court erred in several ways in calculating their respective sentences under the federal Sentencing Guidelines ("Guidelines"). In reviewing a sentencing court's application of the Guidelines, we must "accept the findings of fact of the district court unless they are clearly erroneous and ... give due deference to the district court's application of the guidelines to the facts." 18 U.S.C. § 3742(e) (1988). *See United States v. Shoulberg,* 895 F.2d 882, 884 (2d Cir.1990). We will not overturn the court's application of the Guidelines to the facts before it unless we conclude that there has been an abuse of discretion.

#### 1. *Parker*

Parker contends that the court erred in two ways: (1) by not treating him as a "minimal" participant in the offenses, and (2) by treating him as one who had abused a position of trust. We find no error or abuse of discretion.

■ In considering the character of Parker's involvement in the robbery, the court decreased the base offense level by two levels pursuant to § 3B1.2 of the Guidelines on the theory that Parker was a "minor" participant. Parker contends that the court was required instead to decrease his base offense level by four levels because he was a "minimal" participant. We disagree.

The Guidelines commentary states that it is "intended" that downward adjustment on the ground that the defendant's participation was minimal "will be used infrequently," Guidelines § 3B1.2 Application Note 2, and describes the hallmarks of minimal participation as including "the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others," *id.* Application Note 1. *See United States v. Colon,* 884 F.2d 1550, 1551–52 (2d Cir.) (drug steerer who had knowledge of

scheme and activities of other participants was not a minimal participant), *cert. denied*, —— U.S. ——, 110 S.Ct. 553, 107 L.Ed.2d 550 (1989).

Here the government introduced evidence that Parker, *inter alia*, knew the activities of the other defendants and the general plan for the robbery, provided information to Moon with the knowledge that it would be used in furtherance of the plan, and provided a rented car to be used in executing the plan. Parker did not meet the Guidelines profile of a minimal participant.

The Guidelines also authorize a two-level increase in the base offense level "[i]f the defendant abused a position of public or private trust ... in a manner that significantly facilitated the commission or concealment of the offense...." Guidelines § 3B1.3. The commentary to this section explains that "[t]he position of trust must have contributed in some substantial way to facilitating the crime and not merely have provided an opportunity that could as easily have been afforded to other persons." *Id.* Application Note 1.

Parker argues that his position as a security guard could not have facilitated the commission of the crime in any substantial way because the Payroll car's route to the AT&T building had been used for years and was readily knowable "by any employee." (Parker brief on appeal at 38.) Be this as it may, Parker was the only defendant who on May 13 was a Payroll employee. Moon had not worked there in two months, and it could only facilitate his planning and the execution of the crime to have confirmation from an insider as to the description of the Payroll car and the time it was likely to arrive. Parker concedes that because of his position he "could have confirmed the *details* of car, personnel and route that were already known by Keith Moon, and upon which he had planned this robbery." (*Id.* at 39; emphasis in original.) The district court did not abuse its discretion in determining that Parker's position at Payroll contributed in a substantial way to facilitating the crime.

## 2. *Moon*

Moon makes several challenges to the court's calculation of his sentence. He contends (1) that the court misapplied the Guidelines in (a) determining his role in the crime, and (b) taking account of the total amount of money in the Payroll car rather than just the amount eventually taken from that car, and (2) that the court's refusal to reduce his sentence because of his continued claim of innocence after trial violated his right to due process. None of his contentions has merit.

Section 3B1.1 of the Guidelines provides that the court should increase the defendant's base offense level by four levels if he was an "organizer" of a criminal activity that involved five or more participants, but should increase it by only three levels if he was a "manager or supervisor (but not an organizer ... )." The commentary to this section states that in order to distinguish an "organizer" from a "manager," the court should consider such factors as

the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, ... the degree of participation in planning or organizing the offense, ... and the degree of control and authority exercised over others.

Guidelines § 3B1.1 Application Note 3.

The court did not err in determining that Moon was an organizer. The government's evidence showed that Moon, *inter alia*, planned the details of the robbery, recruited his friends as accomplices, assigned them their roles in the scheme, and controlled distribution of the proceeds of the crime.

The Guidelines with respect to robbery offenses also provide for variations in offense level depending on the amount of loss. A two-level increase is provided for a loss between $50,000 and $250,000; a three-level increase is provided for a loss between $250,000 and $800,000. Guidelines § 2B3.1(b)(6). The court increased Moon's base offense level by three levels because the amount of cash in the

ambushed Payroll car was $357,000. Parker contends that the increase should have been only two levels because the robbers took from the car only $247,000. We disagree.

The Guidelines commentary defines "loss" as "the value of the property taken, damaged, or destroyed." Guidelines § 2B1.1 Application Note 2. Property removed from its rightful owner is properly considered taken even if it is immediately thereafter recovered. *See id.* There can be no doubt that under this definition, the robbers must be charged with theft of the entire amount of cash in the Payroll car; they removed the car's occupants and drove the car away. Plainly they exercised dominion and control over the car and its contents. The fact that they did not transfer all of the cash from the stolen car to their getaway car does not mean that they had not taken it.

Finally, Moon challenges the constitutionality of § 3E1.1 of the Guidelines, which provides for a two-level reduction in the offense level of a defendant who clearly accepts personal responsibility for his acts. Moon, who has continued to deny participation in the robbery, contends that the refusal to grant him this two-level reduction penalizes him for maintaining his innocence and thus denies him due process. This contention is meritless.

█ One of the goals of sentencing is rehabilitation, *see, e.g., United States v. Grayson,* 438 U.S. 41, 45–48, 98 S.Ct. 2610, 2613–14, 57 L.Ed.2d 582 (1978); *Williams v. New York,* 337 U.S. 241, 247–48, 69 S.Ct. 1079, 1083–84, 93 L.Ed. 1337 (1949), and a defendant's admission of responsibility or expression of contrition "is often a significant first step towards his rehabilitation and, for that reason, deserving of a possible reward in the form of a lessened sentence," *Smith v. Wainwright,* 664 F.2d 1194, 1196 (11th Cir.1981). Admission of guilt thus may properly be taken into account in determining what sentence is needed to achieve rehabilitation. *See Brady v. United States,* 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970). In *Brady,* the Supreme Court stated, "we cannot hold

that it is unconstitutional for the State to extend a benefit to a defendant who in turn extends a substantial benefit to the State and who demonstrates by his plea that he is ready and willing to admit his crime and to enter the correctional system in a frame of mind that affords hope for success in rehabilitation over a shorter period of time than might otherwise be necessary." *Id.* at 753, 90 S.Ct. at 1471.

█ Though the *Brady* Court's statement was made in the context of a system that permitted a reduction of sentence where a defendant had simply pleaded guilty, it is equally pertinent to the Guidelines provision challenged here. We reject Moon's contention that the availability of a sentence reduction to one who clearly admits personal responsibility for the offense is the equivalent of an increase in sentence for one who does not. We, like the Eleventh Circuit, "are unprepared to equate the possibility of leniency with impermissible punishment." *United States v. Henry,* 883 F.2d 1010, 1011 (11th Cir.1989) (per curiam). *Accord United States v. Gonzalez,* 897 F.2d 1018, 1021 (9th Cir.1990) ("possibility of leniency in the statute does not make denial of lenient treatment impermissible [under the Fifth Amendment] where the district court determines that the defendant has failed to exhibit the requisite contrition"); *United States v. White,* 869 F.2d 822, 826 (5th Cir.) (per curiam) (denial of leniency for contrition to one who is not contrite does not violate Sixth Amendment right to trial by jury), *cert. denied,* —— U.S. ——, 109 S.Ct. 3172, 104 L.Ed.2d 1033 (1989); *see also United States v. Thompson,* 476 F.2d 1196, 1201 (7th Cir.) ("show of lenience to those who exhibit contrition by admitting guilt does not [constitute] ... a policy of penalizing those who elect to stand trial"), *cert. denied,* 414 U.S. 918, 94 S.Ct. 214, 38 L.Ed.2d 154 (1973).

█ We also reject Moon's argument that any requirement that he acknowledge personal responsibility in order to gain the benefit of the two-level reduction impermissibly prejudices his right to appeal his conviction. "Persons involved in the criminal law process are faced with a variety of

choices. Some of the alternatives may lead to unpleasant consequences." *United States v. Henry*, 883 F.2d at 1011. For example, a defendant has no constitutional right to an appeal from his criminal conviction, *see Abney v. United States*, 431 U.S. 651, 656, 97 S.Ct. 2034, 2038, 52 L.Ed.2d 651 (1977); *McKane v. Durston*, 153 U.S. 684, 687, 14 S.Ct. 913, 914, 38 L.Ed. 867 (1894), and as to any nonjurisdictional question, a defendant who has elected to plead guilty loses even his statutory right of appeal, *see, e.g., United States v. Sykes*, 697 F.2d 87, 89 (2d Cir.1983). For all of these reasons, we see no violation of due process in the Guidelines' provision for lenience for a defendant who has taken the desired step toward rehabilitation, or in the denial of lenience for one who has not.

## CONCLUSION

We have considered all of defendants' arguments on these appeals and have found no basis for reversal. The judgments of conviction are affirmed.