*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0062p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee/Cross-Appellant,*

            *v.*

CHARLES THOMAS ALLEN, II, *et al.,*
            *Defendants-Appellants/Cross-Appellees.*

Nos. 06-5077/5079/5103/5104/
5153/5154/5155/5157

>

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 05-00039—Jennifer B. Coffman, Chief District Judge.

Argued:  December 5, 2007

Decided and Filed:  February 5, 2008

Before:  RYAN, BATCHELDER, and GRIFFIN, Circuit Judges.

---

## COUNSEL

**ARGUED:**  Patrick F. Nash, Lexington, Kentucky, Michael R. Mazzoli, COX & MAZZOLI, Louisville, Kentucky, Fred E. Peters, LAW OFFICES OF FRED E. PETERS, Lexington, Kentucky, Adele Burt Brown, Lexington, Kentucky, for Appellants.  Kevin R. Gingras, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.  **ON BRIEF:**  Patrick F. Nash, Lexington, Kentucky, Michael R. Mazzoli, COX & MAZZOLI, Louisville, Kentucky, Fred E. Peters, John L. Tackett, LAW OFFICES OF FRED E. PETERS, Lexington, Kentucky, Adele Burt Brown, Lexington, Kentucky, for Appellants.  Kevin R. Gingras, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Charles P. Wisdom, Jr., ASSISTANT UNITED STATES ATTORNEY, Lexington, Kentucky, for Appellee.

---

## OPINION

---

        ALICE M. BATCHELDER, Circuit Judge.  Defendant-Appellants Charles Allen, Eric Borsuk, Warren Lipka, and Spencer Reinhard (collectively "defendants") appeal from the district court's imposition of 87-month prison sentences.  All four defendants claim an identical error in the sentence calculation and the government cross-appeals, claiming an identical error in all four sentences.  Because we resolve these claims identically for all four defendants, we have consolidated all eight appeals into this single opinion.  Defendant Allen claims two additional errors, peculiar to his sentence, and we address those two claims individually, within this same opinion.  The convictions, which followed from guilty pleas without written plea agreements, are not at issue.

1

## I.

The defendants were college buddies (19-20 years old) who hatched a plan to steal rare books from the special collections library at Transylvania University (Lexington, KY) and sell them at auction in New York City. Their earliest musings began in January 2004, but the actual robbery did not occur until December 17, 2004. They were apprehended February 11, 2005, pleaded guilty on April 21, 2005, were sentenced to prison on December 15, 2005, and appealed December 23, 2005.

In July 2004, after months of idle discussion, these four men decided in earnest to carry out the robbery, which led to months of research (about rare books, auction houses, Swiss Bank accounts, etc.), brainstorming, and planning. As planning progressed, each of the four took on separate responsibilities: Warren Lipka created aliases (e.g., "Walter Beckman") with fictional backgrounds, set up email accounts for those aliases, and contacted the library and various auction houses. Spencer Reinhard created disguises, drew floor plans and maps, and created false documents. Eric Borsuk and Chaz Allen staked out the library to determine staffing and security, planned the getaway (e.g., got a car, planned the route, etc.), and generally financed the operation (e.g., made hotel accommodations in New York and purchased snacks for the trip).

They determined that the best time for the robbery was December, just before the University's fall term ended. They also decided to use Christie's auction house (New York, NY) to sell the stolen books. The plan involved only certain, rare and very valuable books.

On December 3, 2004, while posing as one "Walter Beckman," they sent an email to Christie's "private sales department," claiming to be "in possession of rare books . . . worth millions," and seeking a meeting in late December 2004. On December 7, 2004, "Beckman" sent another email, apparently in response to a Christie's reply, this time stating: "I have a first addition [sic] Origin of Species by Charles Darwin, manuscripts that date back to the 1500s, and a collection of John James Audubon's Qquadrupeds [sic] and Birds of America. I know that these books are worth a lot . . . ." The email concluded with a renewed request for a December meeting.

Meanwhile, Lipka, again representing himself as "Walter Beckman," an out-of-town businessman, telephoned Mrs. B.J. Gooch, the Special Collections Librarian at the Transylvania University Library, to request an appointment to view several of the library's rare books, including: *Origin of Species*, *Illuminated Manuscripts*, and the John James Audubon collection. Mrs. Gooch agreed and scheduled the appointment for 2:00 p.m. on Thursday, December 16, 2004. On December 6, 2004, "Beckman" (Lipka and Reinhard) sent an email (from a University of Kentucky computer lab) to Mrs. Gooch, confirming the appointment and again specifying an interest in "the famous Audubon books, the first addition [sic] Darwin, and any of the Illuminated Manuscripts."

On Monday or Tuesday, December 13 or 14, "Beckman" called Mrs. Gooch and rescheduled for 3:30 p.m. Thus, on Thursday at 3:30 p.m., the robbery was finally at hand and after months of planning, this was the plan: all four men would enter the library, take the books by force, and run for it. They arrived at the library dressed as "old men" — makeup, wigs, hats, and costumes, such as "one would typically see worn in a play or some other type of theatrical performance" — but aborted the plan at the last minute. The exact reason for aborting is unclear; they may have seen a flaw in the plan or simply panicked, though it was suggested that a student, unaware of the impending robbery, recognized one of them and asked what they were doing in those ridiculous costumes. The costumes were sufficiently ridiculous that two library employees, including Susan Brown, the Director of the Library, noticed them, but merely assumed some sort of college prank or goof.

At approximately 4:00 p.m. that afternoon — after aborting and fleeing — "Beckman" called Mrs. Gooch and apologized for missing the appointment, claiming to have been out of town for work. He asked to reschedule for the next morning, Friday, December 17, 2004, at 11:00 a.m. Mrs. Gooch reluctantly obliged, and agreed that he could bring a friend to view the books as well.

When Lipka, posing as "Walter Beckman," arrived for the appointment at slightly after 11:00 a.m. on Friday, Mrs. Gooch was surprised by two things: (1) he was much younger than she had expected, and (2) he was wearing an unseasonably heavy coat, gloves, and hat. After establishing that the elevator was working and there were no cameras in the library, "Beckman" asked if he could have his friend join them. When Mrs. Gooch agreed, he made a call on his cell phone and "within one minute," a second man arrived (Eric Borsuk) — wearing a heavy coat, a bandage on his face, and eyeglasses — who introduced himself as "John." Both men signed in with illegible signatures.

Once inside the Special Collections Library, the two men wrestled Mrs. Gooch to the ground, and began zapping her in the arm with a pen-type stun gun, which caused a tingling sensation and left a small bruise, but did not cause any significant pain or lasting harm. Mrs. Gooch screamed, though she knew that no one could hear her from that location in the library, but she did not panic. She testified that, while being subdued, she felt the tingling, heard an electric humming and popping noise, and feared that she was being zapped with a stun gun. She was particularly unnerved, however, when Lipka — whom she did not know — called her by her first name, warning her: "B.J., if you just keep on struggling, it will only hurt more. Do you want it to hurt more?" Greatly frightened by this threat, her awareness of the stun gun, and the hair-raising intimacy of the robber having used her first name so casually, Mrs. Gooch submitted and the two men bound her hands and feet with plastic zip ties. They also removed her glasses and covered her eyes with a stocking cap.

Lipka and Borsuk then began to collect the seven (7) "objects of cultural heritage" — some comprising multiple volumes or pieces — that Mrs. Gooch had set out in anticipation of the appointment, and prepared to carry them from the library by way of an elevator to a first-floor emergency exit. These seven "objects," all of which were eventually recovered undamaged, were later appraised by Sotheby's (New York, NY), and have been described as follows:

1.   *Hortus Sanitatis, Ortus Sanitatis translate de Laten en Francois*. Paris, circa 1500. Two volumes, with four full-page woodcuts and approximately 450 woodcut illustrations in the text. Estimated value: $450,000.

2.   Pencil drawings, believed to have been commissioned for *The Birds of America, Second Octavo Edition*. New York and Philadelphia, circa 1855. Twenty of a 21-piece collection (one drawing was on display, and hence, not with the collection at the time of the robbery). Estimated value: $50,000.

3.   *A Synopsis of the Birds of North America*, by John James Audubon. New York, 1839. Eight volumes, mostly unopened. Autographed by John James Audubon himself, as a gift to a friend. Estimated value: $10,000.

4.   *On the Origin of Species by Means of Natural Selection*, by Charles Darwin. London, 1859. First edition; rebound. Estimated value: $25,000.

5.   *Illuminated Manuscript, Devotional Calendar.* England, circa 1425. Sixty leaves, one full-page miniature, and elaborate initials and illuminations throughout. Estimated value: $200,000.

6.     *The Birds of North America from Original Drawings*, by John James
        Audubon. London, 1827-1838. Four (4) volumes, elephant folio, 435 hand-
        colored engraved plates. Estimated value: $4,800,000.

7.     *The Viviparous Quadrupeds of North America*, by John James Audubon and
        John Bachman. New York, 1845-1848. Three (3) volumes, with 150 hand-
        colored lithograph plates. Estimated value: $225,000.

There is some dispute as to whether the robbers intended to take only certain objects or "as much as they could carry," but, as evidenced by their planning, they had clearly foreseen that the objects they coveted would be very large and heavy. Consequently, they brought with them a (pink) bed sheet, which they laid out on the floor, for carrying the objects. Apparently, even with their planning, however, they had underestimated the sizes and weights, and they were forced to abandon two of the *Birds of North America* volumes, which were left in the Special Collections Library, atop the pink bed sheet. They also abandoned other volumes, later, while fleeing from the librarians.

To return to the story, Lipka and Borsuk had, in a matter of minutes, collected these seven objects — except for the two *Birds of North America* volumes that they had abandoned on the pink bed sheet, and one of the three *Quadrupeds of North America* volumes, which had become stuck in its drawer — and were preparing to abscond with them. According to the (revised) plan, they would take the "employee-only" elevator down to the first floor and escape through an emergency exit, where Allen was waiting in a van (which they dubbed the "GTAV," i.e., the "get to and away vehicle") to drive them home to stash the "loot." Reinhard was standing watch across the street.

Apparently Lipka and Borsuk had some difficulty operating the elevator, however. Head librarian Susan Brown was in the library's basement at the time and, prompted by the unexpected "ding" of the elevator's opening doors, she turned her attention to see who would be using the elevator. She was startled when the doors opened to reveal not employees, but Lipka and Borsuk, in their heavy coats and gloves, holding some of the library's most prized and valuable possessions. Realizing that something was amiss, Ms. Brown started for the elevator, but Lipka and Borsuk quickly got the doors closed and the elevator moving again. Alarmed, Ms. Brown ran up the stairs to Special Collections in search of Mrs. Gooch. Meanwhile, Mrs. Gooch had realized that, due to the department's security measures, Lipka and Borsuk could not re-enter the Special Collections Department from the elevator, and she had begun to free herself to call for help. She yelled to Susan Brown that they were being robbed, and Ms. Brown wheeled around to pursue the robbers.

She caught up to them in a stairwell where they were attempting to open the emergency exit and, surprised by her arrival and aggressive confrontation, they dropped several objects — specifically, the two remaining volumes of the *Birds of North America* four-volume set (they had left two volumes atop the pink bed sheet in the Special Collections Department) and the two volumes of the *Quadrupeds* three-volume set (one of the three volumes had been left behind, stuck in its drawer in the Special Collections Department). Lipka and Borsuk fled through the emergency door carrying five objects (*Hortus Sanitatis*, the 20 pencil drawings, *Synopsis of the Birds of North America*, *Origin of Species*, and *Illuminated Manuscript*), with Ms. Brown and other librarians in hot pursuit. Lipka and Borsuk scrambled into the waiting van and Allen sped away, though not before Ms. Brown had scratched the van with a key in an attempt to mark it for later identification. Once the robbers had escaped, the police were called, but before the police could document the crime scene, some librarians collected the discarded objects and returned them to their proper places.

Allen, who had borrowed the van from an uncle or a cousin, let Lipka and Borsuk out several blocks away, went to drop off the van, and returned to pick up Lipka and Borsuk in a different car. The three of them went home and hid the stolen objects in the basement of their residence, in a

"semi-hidden room" — the entrance to the room was disguised to conceal the fact that they had marijuana growing in there. They then gathered up evidence related to the robbery, including planning documents, the disguises, and the stun pen, and disposed of it all in a nearby dumpster. Reinhard, who was enrolled at Transylvania University, stayed on campus to take an exam.

Having told their parents that they were going on a ski trip over Christmas break, the four men left Lexington on Sunday, December 19, 2004. But they actually drove to New York City to keep their appointment at Christie's and have the objects appraised. On December 21, 2004, Lipka and Reinhard, claiming to be "Mr. Stephens" and "Mr. Williams" — representatives of "Walter Beckman," who they described as "a very private individual who was interested in selling some rare books through Christie's private sales service" — met with Christie's representative Melanie Halloran. After reviewing the objects for approximately 15 minutes, Ms. Halloran agreed that Christie's could sell the objects for "Mr. Beckman." Reinhard gave Ms. Halloran his cell phone number so that she could contact him and the four men returned home with the objects.

Meanwhile, police were investigating the emails that "Walter Beckman" had sent to Mrs. Gooch from the account "Beckmanwalter@yahoo.com." Yahoo account records immediately revealed the series of emails between "Beckman" and Christie's, and through some further investigation, the police determined that the emails had been sent from a computer lab at the University of Kentucky. By January 2005, the police, in concert with the FBI, had contacted Christie's and spoken with Ms. Holloran, who gave them the cell phone number that Reinhard had given her at the close of the December 21, 2004, meeting. By early February 2005, the police had linked that number to an account held by Reinhard's father and had determined that Reinhard was the primary user of that particular number. Following these leads, the police put together photo lineups and positively identified Lipka and Reinhard. This led to search and arrest warrants.

Police executed the warrants on February 11, 2005, apprehended the four men, and recovered all five objects (*Hortus Sanitatis*, the 20 pencil drawings, *Synopsis of the Birds of North America*, *Origin of Species*, and *Illuminated Manuscript*) undamaged. Police also recovered three stun guns (though not the "stun pen" allegedly used in the robbery), notes pertaining to planning of the robbery, and clothes worn by the men to the robbery and the meeting at Christie's. A federal grand jury indicted each of the men on six counts: (1) conspiracy to commit robbery, in violation of 18 U.S.C. § 1951(a), with a statutory maximum term of 20 years in prison; (2) aiding and abetting robbery, § 1951(a), 20 years; (3) conspiracy to commit offenses against the United States, § 371, five years; (4) aiding and abetting the theft of objects of cultural heritage, § 668(b)(1) & (2), 10 years; (5) aiding and abetting transportation of stolen goods, § 2314, 10 years; and (6) aiding and abetting possession and concealment of stolen goods, § 2315, 10 years. They each pleaded guilty to all counts on April 21, 2005, and the court released them on their own recognizance pending sentencing.

In March 2005, Allen and his attorney had contacted the government to offer information that they hoped would lead to a reduction in Allen's prison sentence, pursuant to U.S.S.G. § 5K1.1, on the premise that the information would provide "substantial assistance" in the investigation and prosecution of other, unrelated offenses. On March 8 and 15, 2005, Allen and his attorney met with the Assistant United States Attorney (AUSA) handling the case. Prior to the exchange of any information, the parties signed a "cooperation agreement," which characterized the meetings as "off the record" and specified that Allen would receive direct-use immunity for any information provided, but acknowledged that the government could pursue any leads obtained and could cross examine Allen with the information if he testified in a manner contrary to the information. State prosecutors were also included in the second meeting, to share the information and ensure direct-use immunity from state prosecution as well. Once Allen and his attorney were satisfied with the immunity agreement, Allen offered information about certain illegal activities — burglaries,

gambling, blackmail, and drug dealing — in which he and others, including certain co-defendants, had been involved or about which he had knowledge. Detectives verified some of the information, but ultimately, neither the state prosecutors nor the AUSA was interested. Finding that the information was not of any particular use to the government, the AUSA declined to file a § 5K1.1 motion.

In October 2005, at a hearing concerning pre-sentencing motions, the district court judge revealed that the AUSA had disclosed to the probation office much of the information given by Allen during the "off the record" meetings in March. And a probation officer had, in turn, relayed this "off the record" information to the district court judge. The AUSA candidly admitted that he had disclosed the information to the probation office for the express purpose of having it included in the Presentence Investigation Report (PSR). Allen moved the court to find the AUSA in breach of the cooperation agreement and sought sanctions for that breach, on the theory that he feared retaliation for his disclosures, that the breach had tainted the PSR, and that the breach had undermined the effectiveness of his attorney, who had recommended the meeting and disclosures. The district court stated that she thought the AUSA had "dealt unfairly" with Allen by leading him to believe that his information was of value (and would thus likely lead to a § 5K1.1 motion), but the AUSA had not breached the agreement, and consequently, the court denied the motion. The district court did, however, order that the information be omitted from the PSR and stated explicitly and emphatically that she would not rely on that information in calculating the guidelines or imposing sentence.

With regard to sentencing, Allen argued that there was no actual loss, based on the theory that all of the objects were recovered undamaged, and argued against the government's use of the estimated values of the objects, *see* U.S.S.G. § 2B3.1(b)(7). Allen also argued for reduction of his sentence on the theory that he was only a "minor participant." *See* U.S.S.G. § 3B1.2(b).

All four defendants argued against an enhancement for use of a dangerous weapon on the theory that the "stun pen" was not actually dangerous. *See* U.S.S.G. § 2B3.1(b)(2)(D). The government opposed these arguments, and a debate ensued about *which* objects should be used for the valuation: just the five actually removed from the library proper (i.e., *Hortus Sanitatis*, the 20 pencil drawings, *Synopsis of the Birds of North America*, *Origin of Species*, and *Illuminated Manuscript*); or the objects removed from the Special Collections Department (i.e., the above five, plus the two volumes of *Birds of North America* and two volumes of *Quadrupeds* that were dropped in the stairwell, although it was unknown exactly which volumes these were, because librarians had returned them to their proper places before the police could document the crime scene); or all seven objects targeted by Lipka and Borsuk. Each of these options resulted in a different valuation, and because it was unknown which volumes were actually removed from the Special Collections Department and individual volumes have different values, a debate ensued over the appropriate estimated value of this middle option.

In summary, the three options for deciding which objects to include in the tabulation, for valuing the objects, and for calculating the advisory sentencing guidelines, look like this:

1. All seven of the targeted objects:          $5,760,000  (18-level enhancement).

2. Just those removed from the Special Collections Department (four unspecified volumes from the *Birds of North America* and *Quadrupeds* collections):

   Government's value estimate:          $3,285,000  (18-level enhancement),

   Defendants' value estimate:          $1,985,000  (16-level enhancement).

3.    Just those removed from the library:     $   735,000   (14-level enhancement).

*See* U.S.S.G. § 2B1.5(b)(1)(B) (referring to § 2B1.1(b)(1)). In calculating an advisory guideline range for inclusion in the PSR, the probation department had used the defendants' estimate for option two, which resulted in a 16-level enhancement and a preliminary range of 108 to 135 months in prison. The court, however, in conducting its own calculations, determined that it would value the loss based on only the five objects actually removed from the library (i.e., option three), which led to a 14-level enhancement, *see* U.S.S.G. § 2B1.5(b)(1)(B) (referencing § 2B1.1(b)(1)(H), a 14-level enhancement for a loss of $400,000 to $1,000,000), and a guideline range of 87 to 108 months.

In calculating this range, the court denied Allen's argument that he was merely a minor participant and the defendants' argument that the stun pen was not a dangerous instrument. The court imposed the same sentence on all four men: 87 months in prison (the low end of the range). Allen appealed, arguing that the court erred by refusing to sanction the government for breaching the cooperation agreement (i.e., by refusing to award a downward departure as a remedy for the breach), by declining to characterize Allen as a "minor participant," and by finding the stun pen a dangerous instrument. The other three defendants also appealed, arguing only that the court had erred by declaring the stun pen to be a dangerous weapon. The government cross appealed, arguing that the court erred by excluding the objects dropped in the stairwell from its valuation of loss, and correspondingly, from its computation of the sentencing range. We find no merit to any of defendants' arguments, but because we find that the government's argument does have merit, we will remand for resentencing in conformity with this opinion.

## II.

In an appeal from a sentencing order, we must determine whether the district court's determination was reasonable — both procedurally and substantively. *Gall v. United States*, 552 U.S. --, 128 S. Ct. 586, 597 (2007). Procedural reasonableness requires that we "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the [United States Sentencing] Guidelines range." *Id*. Only if the district court's sentencing decision is procedurally reasonable, do we then consider the substantive reasonableness. *Id*. In the present case, we find the sentencing decision procedurally unreasonable, and therefore, we do not reach the question of substantive reasonableness, with its associated presumption of reasonableness for sentences falling within the guidelines range. *See Rita v. United States*, 551 U.S. --, 127 S. Ct. 2456, 2462 (2007). We review the district court's application of the Sentencing Guidelines *de novo* and the district court's findings of fact for clear error. *United States v. Davidson*, 409 F.3d 304, 310 (6th Cir. 2005); *United States v. Tocco*, 306 F.3d 279, 284 (6th Cir. 2002).

## A.

Allen argues that the district court erred by refusing to reduce his sentence as a sanction for the government's alleged breach of his cooperation agreement. We disagree.

Allen contends that the AUSA breached the cooperation agreement when he relayed Allen's self-incriminating information — proffered to the AUSA in an attempt to obtain a § 5K1.1 motion for downward departure — to the probation department for inclusion in the PSR. The district court ruled that the agreement had not been breached, in that the information was not actually included

in the PSR or used against Allen in any way.[1]  The district court also held that the AUSA did not act in "bad faith" when he disclosed the information, so there was no basis for sanctions.

The question looms as to whether an AUSA breaches a cooperation agreement by disclosing a defendant's proffered information in a manner other than as expressly provided for in the agreement, such as a disclosure to the probation department for inclusion in the PSR.  But, as it turns out, that question is of little moment in this case and we need not decide it now.  That is, even if the AUSA breached the agreement, we reach the same conclusion as the district court did with regard to harm — Allen cannot show any harm, inasmuch as the information was neither included in the PSR nor relied upon by the district court in calculating and imposing Allen's sentence.

Allen contends that a "cooperation agreement" is the same as, or analogous to, a "plea agreement," and, citing *Cohen v. United States*, 593 F.2d 766 (6th Cir. 1979), and *Santobello v. New York*, 404 U.S. 257 (1971), he argues that he need not show harm because the breach of a "plea agreement" may warrant resentencing even without any consequential harm.  In *Cohen*, 593 F.2d at 771, we quoted *Santobello*'s reasoning — "when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be a part of the inducement or consideration, such promise must be fulfilled" — and we explained that "the touchstone of *Santobello* is whether the prosecution met its commitment [to make a sentencing recommendation] and not whether the court would have adopted the government's recommendation."  The key phrase here is "must be fulfilled," which is to say that the defendant is entitled to *specific performance* of the promise.

But the *Cohen*-and-*Santobello* reasoning does not fit the facts of this case.  There was no plea agreement in this case, there was no *quid pro quo* to Allen's entry of his plea, and there was no sentencing recommendation for the AUSA to fulfill, the sentencing court to consider, or this court to order the government to perform.  The AUSA's promises of § 5K1.1 consideration and direct-use immunity were not "part of the inducement or consideration" for Allen's entry of his guilty plea and it cannot be said that the "plea rests in any significant degree on a promise or agreement of the prosecutor."  *See id*.  Instead, the AUSA, desirous of Allen's secret information, promised:  (1) to seek a sentence reduction, if the information were deemed worthy; and (2) not to use the information against Allen, except under certain circumstances.  As the information was not deemed worthy, the first promise is not at issue.  Similarly, neither of the exceptions is at issue.  The result is that Allen disclosed the information in exchange for the AUSA's promise not to use that information against him and, despite the disclosure by the AUSA, it is undisputed that the information was not used against him; it was omitted from the PSR and ignored by the sentencing judge.  Specific performance of the agreement would entitle Allen to no more than he has already received.

Under these facts, the absence of harm renders the claim not actionable, and the (presumed) breach offers no basis for this court to order "resentencing," which is the only remedy sought.[2]  To be sure, Allen is decidedly vague in his prayer for relief, stating only:  "Mr. Allen requests that his sentence be vacated and the matter remanded for resentencing, with a specific directive that the

---

[1]To be clear, the district court was emphatic that this information was not used against *any of the four defendants* in any way.  Thus, while this subsection is specifically directed at Allen — as it is prompted by Allen's specific appeal — all of the findings, reasoning, and conclusions related to Allen apply equally to the other three.

[2]Allen also claimed that, in addition to tainting the sentencing, the disclosure put him in fear of retaliation and undermined the effectiveness of his attorney.  But, according to the record, he has sought no relief based on these alleged harms — he has not moved for protection from his co-defendants, nor has he replaced his attorney.  Indeed, he was appointed an appellate attorney, but successfully moved the court to replace that attorney with his trial attorney for the duration of this appeal.  Therefore, we decline to consider these claims further.

sentencing judge consider remedies and sanctions for the AUSA's breach of the cooperation agreement." Allen was more specific in his plea to the district court, requesting that the district court: (1) strike the AUSA's sentencing memoranda; (2) strike the AUSA's objections to the PSR; (3) deny the AUSA the opportunity to express any opinion on sentencing; (4) deny the AUSA any cross-examination of Allen's proffered expert[3]; (5) grant Allen a "minor participant" downward departure; and (6) grant an additional downward departure as a sanction for the breach. Each of these professed "remedies" involves resentencing, however, and, as noted earlier, Allen cannot demonstrate, or even point to, any error in his sentence attributable to a breach of the agreement.

It is also noteworthy that Allen never requested — and indeed declined numerous invitations to request — that the district court judge recuse herself from this case or the sentencing. Thus, insinuations of latent "unfairness" at the hands of the sentencing judge are improper and unseemly. In actuality, Allen merely seeks to sanction the AUSA — to Allen's benefit — for conduct that may have been improper, but which resulted in no harm. This is not a legal basis for resentencing.

Ordinarily, we review the denial of a motion for sanctions for an abuse of discretion. *See In re Downs*, 103 F.3d 472, 480 (6th Cir. 1996) (discovery sanctions); *Hood v. Smith's Transfer Corp.*, No. 98-5917, 1999 WL 685920, *2 (6th Cir. Aug. 26, 1999) (bankruptcy sanctions). We see no reason to treat this review differently. An abuse of discretion occurs when the district court relies on clearly erroneous findings of fact, improperly applies the governing law, or uses an erroneous legal standard. *United States v. Lineback*, 330 F.3d 441, 443 (6th Cir. 2003). Allen points to no contentious facts, improper application of the law, or erroneous legal standard; Allen merely believes — and urges this court to agree — that the AUSA's disclosure is deserving of sanctions.

This argument is without merit.

**B.**

Allen argues that the district court erred by refusing to characterize him as a "minor participant" and reduce his sentence accordingly. We disagree.

The sentencing guidelines instruct the district court to decrease a defendant's offense level based on the defendant's role in the offense: "If the defendant was a minimal participant in any criminal activity, decrease by 4 levels[;] [i]f the defendant was a minor participant in any criminal activity, decrease by 2 levels[; and,] [i]n cases falling between ["minimal"] and ["minor"], decrease by 3 levels." U.S.S.G. § 3B1.2. On appeal, Allen pleads for a three-level decrease.

A "minimal participant" is one "who plays a minimal role in concerted activity." *Id*. at Application Note 4. Those dubbed "minimal participants" are "plainly among the least culpable of those involved in the conduct of a group. . . [based on a] lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others [within the group]." *Id*. Allen conceded to the district court that he cannot be characterized a "minimal participant."

A "minor participant" is a defendant "who is less culpable than most other participants, but whose role could not be described as minimal." *Id*. at Application Note 5. Allen argues that he was the least culpable of the four, and he should therefore receive a three-level reduction (for something

---

[3]The court did prohibit the AUSA from using the proffer information in cross-examining Allen's expert.

more than "minor participant" but less than "minimal participant").**4**  Allen deems himself less culpable because:  (1) his ideas and suggestions were routinely rejected during the planning stages, (2) he had no contact with the "public" during either the robbery or the meeting with Christie's, and (3) he was relegated to conducting surveillance, driving the get away car, and accompanying the others on their trip to New York.  Thus, according to Allen, his role was not "indispensable," and he should be punished less severely than the other three participants.

The government responds by reminding us that the degree of participation and culpability is a factual determination entitled to review for only clear error.  *See United States v. Harris*, 397 F.3d 404, 409 (6th Cir. 2005).  With this in mind, the government points out that Allen was responsible for:  (1) visiting the library prior to the robbery to gather intelligence, such as staffing and security; (2) conducting a "stake-out" of the library to gather even more intelligence; (3) developing the escape route; (4) obtaining and driving the escape vehicle; (5) arranging hotel accommodations in New York; and (6) helping to finance the operation.  On Thursday, December 16, Allen — like the other three — went to the library dressed in an "old man" costume.  On Friday, December 17, Allen drove the get-away vehicle and ensured the escape from the pursuing librarians, before helping to hide the stolen objects in his residence and dispose of the evidence from his residence.  And, Allen helped transport the stolen objects to Christie's in New York and back to Kentucky.

There is no basis for the claim that the district court clearly erred by finding that Allen was just as culpable as the other three participants.  This argument is without merit.

## C.

All four defendants argue that the district court erred by finding that the use of the "stun pen," under these circumstances, justified the dangerous weapon enhancement.  We disagree.

The sentencing guidelines, with regard to "cultural heritage resources," specify a two-level enhancement "if a dangerous weapon was brandished or its use was threatened."  U.S.S.G. § 2B1.5(b)(6).  A "dangerous weapon" includes even "an object that is not an instrument capable of inflicting death or serious bodily injury but closely resembles such an instrument; or the defendant used the object in a manner that created the impression that the object was such an instrument." U.S.S.G. § 1B1.1, Application Note 1(D)(ii).  The district court found that because the defendants used the stun pen on Mrs. Gooch, a "dangerous weapon was brandished [and] its use was threatened," and applied the two-level enhancement.  The defendants protest this finding.

We review this dangerous-weapon finding for clear error.  *United States v. Rodriguez*, 301 F.3d 666, 668 (6th Cir. 2002).  In the district court, however, the issue was not whether the stun pen was used; rather, "[t]he ultimate inquiry [was] whether a reasonable individual would believe that the object is a dangerous weapon under the circumstances."  *Id.* (explaining that a styrofoam box was reasonably regarded as a bomb, based principally on the robber's conduct); *see also United States v. Woodard*, 24 F.3d 872, 874 (6th Cir. 1994) (finding that a toy gun was reasonably regarded as a real gun).  Thus, the question for us is whether the district court *clearly erred* in finding that a reasonable person would have believed that the stun pen, as brandished and used by Lipka and Borsuk during the robbery, was capable of inflicting serious bodily injury.

---

**4**The absurdity of this argument should be apparent on its face.  If, for example, the robbery had taken a murderous turn involving a shoot out, and the other three, being far better marksmen, had each shot four victims, while Allen's poor aim had allowed him to shoot only one, then — under Allen's least-culpable-participant theory — he would be entitled to downward departure, inasmuch as he would clearly be the least culpable of the four.  We think not.

In the district court, the defendants produced an expert to testify that the stun pen used in this robbery — advertised as the "Black Cobra 150,000 Volt Stun Gun Pen" — is actually capable of producing no more than 8,000 volts (it is powered by two AAA batteries), and is therefore incapable of causing serious injury, unless it is, perhaps, poked directly into someone's eye.  The government did not dispute this assessment and the *actual* dangerousness of this stun pen is not at issue.  The issue is whether this stun pen could reasonably be *perceived* as being capable of inflicting serious bodily injury, and the defendants contend that it could not.  In his brief on appeal, Allen argues:  (1) that the stun pen "did not resemble a weapon, but instead resembled a pen"; (2) "[a]t no time did any of the defendants represent this object as a weapon, or verbally claim they had a weapon"; and (3) Mrs. Gooch "never saw the weapon and never felt it."  The other defendants have argued that the district court improperly relied on Mrs. Gooch's subjective fear of the stun pen and that her subjective fear was "irrational," because, they argue, no reasonable person could fear that this particular device, as used in these circumstances, could inflict serious bodily injury.

Recall that Lipka and Borsuk wrestled Mrs. Gooch to the ground while zapping her in the arm with stun pen, which caused Mrs. Gooch to feel a tingling sensation and left a small bruise, though it did not cause any significant pain or lasting harm.  Mrs. Gooch testified that, while being subdued, she felt the tingling, heard an electric humming and popping noise, and feared being zapped.  She also testified that Lipka warned her:  "B.J., if you just keep on struggling, *it* will only hurt more.  Do you want *it* to hurt more?"  The "it" was presumably the zapping from the stun pen.  Mrs. Gooch submitted largely because of her fear of the stun pen and Lipka's evident willingness to use it to inflict further pain, i.e., his promise that "it will only hurt more."

Allen's contention that the stun pen "did not resemble a weapon, but instead resembled a pen" is clearly a factual question for the district court and we have no basis or ability to reconsider that question on appeal.  Allen's second contention, that "[a]t no time did any of the defendants represent this object as a weapon, or verbally claim they had a weapon," is simply not true.  None of the defendants has ever — until now — disputed that Lipka said "B.J., if you just keep on struggling, *it* will only hurt more.  Do you want *it* to hurt more?"  The clear representation of this statement was that he had a weapon, was using the weapon, and was prepared to use it more, to inflict more pain, unless she submitted.  Finally, while it may be true that Mrs. Gooch never actually saw the pen, she certainly felt it, at least according to her testimony, which was unrefuted.

This argument is without merit.

**D.**

The government argues that the district court erred by considering only the objects actually removed from the library building in tabulating the loss for its sentencing calculation.  We agree.

The government contends that the district court erred by omitting from its loss computation the two volumes of *Birds of North America* and the two volumes of *Quadrupeds* that Lipka and Borsuk dropped in the stairwell when they were assailed by Ms. Brown.[5]  From this starting point, the value of the loss — even under the defendants' valuation estimates — would have been over $1,000,000 rather than $735,000; the sentence enhancement would have been 16 rather than 14; and the advisory guideline range would have been 108 to 135 months rather than 87 to 108 months.

---

[5]On appeal, the government does not argue for inclusion of the two volumes of *Birds of North America* that were left atop the pink bed sheet or the third volume of *Quadrupeds* that was stuck in its drawer.

We review a district court's interpretation and application of the sentencing guidelines *de novo*, though we review the district court's findings of fact for clear error. *See Tocco*, 306 F.3d at 284; *Davidson*, 409 F.3d at 310. In the instant case, the district court was clearly interpreting and applying the sentencing guidelines, and her explanation is worth quoting at length:

> With regard to the amount of loss, back to your argument on [U.S.S.G. § ] 2X1.1, which I think you may have conceded, but I'm not really sure. And [] these are complex guidelines, I don't doubt that.

> But let me just say 2X1.1 talks about intended offense conduct. There is no leap[,] logically, from that phrase 'intended offense conduct' in 2X1.1 to the measure of loss, intended loss, in 2B1.1. You simply – and this is not a joke. I don't joke at sentencings. You just can't get there from here. You can't get to 2B1.1 [from] 2X1.1 under the facts of this case as I understand them.

> This is the theft of a cultural heritage object. That points us to Section 2B1.5. There is no intended loss component under 2B1.5. It just talks about what is the value of the cultural heritage objects. Value of what, and we're led back to the question[:] is it intended loss or what is taken.

> The Court finds that the measure in 2B3.1 [] is the items taken from the institution, the museum, the entity that was robbed.

> And the Court adopts the position put forward by [the defendants' counsel] that ['taken'] means taken from Transylvania University Library.

> And so that means I don't really have to get into the valuation on the *Birds of America* or the *Quadrupeds*, because those items remained in Transylvania University Library.

> That means that the valuation will be the $735,000 worth of books that the Defendants escaped with.

> I also don't have to talk about whether they were scared off or whether it was complete, because of what I said about 2X1.1.

> I rely on [*United States v. Parker*, 903 F.2d 91 (2d Cir. 1990)] and [*United States v. McCarty*, 36 F.3d 1349 (5th Cir. 1994)] to a certain extent. I've already cited those cases here today. But *Parker* talks about removal from its rightful owner. It is a dominion and control issue, but the notion is what is removed from the zone of control of Transylvania University Library and those big volumes, and it may have been take what they can carry. That may have been the intent, but I do not so find. I just find that the measure of loss is what was taken, and that is the $735,000 worth.

> And let me [] distinguish some things here. To make the dividing line, or the line of demarcation [t]he door of the Special Collections Library in my mind is to create an artificial distinction. [A]nd also to make the dividing point at the cabinet makes an artificial distinction. [U]nder these guidelines, these Defendants are supposed to have taken things. For whatever reason they didn't take the others out of the library. I do rely on the fact that other librarians came and put those volumes back where they belong. They were still within the zone of control of Transylvania Library.

Relying on *Parker* I find that the amount of loss here was $735,000.

So, to summarize: the district court held that "loss" in the table in U.S.S.G. § 2B1.1(b)(1) constitutes things that have been "taken," pursuant to § 2B3.1, and — purporting to rely on *Parker* and *McCarty* — "taken" means removed from "the zone of control," which the district court, in this case, delineated as the library building proper.  Because we review this interpretation and application *de novo*, we need not dwell on the court's reasoning or reading of precedent,[6] but may start anew.

The government urges two theories on appeal:  (1) that the objects to be included in the tabulation are those that the robbers *intended* to take, that intent being evident from the specific identification of those objects in the communications with Christie's and Mrs. Gooch prior to the robbery as well as the handling of those same objects during the robbery; and (2) "taking" includes even those objects abandoned during the course of the escape.  We consider each in turn.

The sentencing guidelines specifically address the theft of "cultural heritage resources," stating:  "If the value of the cultural heritage resource . . . exceeded $5,000, [then] increase [the base offense level of eight (8)] by the number of levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to that amount."  U.S.S.G. § 2B1.5(b)(1)(B).  The application notes to § 2B1.5 provide instruction for assigning or estimating the value of "cultural heritage resources," *see* Application Note 2, but offer no insight on the question of *which* objects disturbed during a robbery to include in the tabulation.  The "table in § 2B1.1" provides a corresponding "increase in [offense] level" for different ranges of "loss," and has the following application note:

> General Rule – Subject to the exclusions in subdivision (D) [i.e., incidental costs, not applicable in this case], loss is the greater of actual loss or intended loss.
>
> 'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense.
>
> 'Intended loss' (I) means the pecuniary harm that was intended to result from the offense; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value).

U.S.S.G. § 2B1.1(b)(1) & Application Note 3(A)(i) & (ii) (edited for clarity and brevity).

To recap:  the theft of "cultural heritage resources" implicates § 2B1.5, which instructs the district court to apply the table in § 2B1.1(b)(1), the application note to which defines loss as "the greater of actual loss or intended loss."  In the present case, the greater of the two is clearly the inclusion of all the objects the robbers *intended* to take, which was all seven objects at a total value of over $5 million.  Based on the table in § 2B1.1(b)(1), this represents an enhancement of 18 levels.

The question left open by the foregoing analysis is whether § 2B1.1's definition of "loss" is the proper definition under the circumstances, or whether another definition would be more appropriate.  Specifically, the guideline for "Robbery" defines loss as "the value of the property taken, damaged, or destroyed," and includes no provision for "intended loss."  U.S.S.G. § 2B3.1 Application Note 3.  Certainly "Robbery" (§ 2B3.1) is a more specific offense than "Offenses Involving Stolen Property" (§ 2B1.1), and there is no dispute that this case involved a robbery.

---

[6] None of the cases cited by the district court, cited in this opinion, or cited in any of the parties' briefs refer to a "zone of control."  This is, in fact, a concept that was heretofore entirely unknown to federal-sentencing case law.

Prior to 2001, both guidelines used the same definition, i.e., "the value of the property taken, damaged, or destroyed," although § 2B1.1 contained additional explanation, including:

> In the case of a partially completed offense (e.g., an offense involving a completed theft that is part of a larger, attempted theft), the offense level is to be determined in accordance with the provisions of § 2X1.1 (Attempt, Solicitation, or Conspiracy) whether the conviction is for the substantive offense, the inchoate offense (attempt, solicitation, or conspiracy), or both[.]

In 2001, the Commission amended § 2B1.1 and redefined "loss" for crimes of Larceny, Embezzlement, and Other Forms of Theft as "the greater of actual loss or intended loss." The commission did not change the definition for Robbery, however, explaining:

> Two referring guidelines (§§ 2B2.1 (Burglary of a Residence or a Structure Other than a Residence) and 2B3.1 (Robbery)) that use the definition of loss previously in § 2B1.1 [i.e., "the value of the property taken, damaged, or destroyed,"] will retain that definition of loss rather than the new loss definition in the consolidated guideline [i.e., "the greater of actual loss or intended loss"]. The existing definition has not proven problematic for cases sentenced under these guidelines.

Thus, it appears from this explanation that the Commission intended for Robbery (and Burglary) cases to continue to be sentenced based on the value-of-the-property-taken definition.

Consequently, the better analysis is: the crime of Robbery implicates § 2B3.1, which defines loss as the value of the property *actually taken*; and the fact that the property taken consisted of "cultural heritage resources" implicates § 2B1.5, which instructs the district court to apply the table in § 2B1.1(b)(1), though without regard to its application note. In the present case, this leads to the government's second issue on appeal, which is how to define what was *actually taken*.

The government argues that the items actually taken must include the two volumes of *Birds of North America* and the two volumes of *Quadrupeds* that Lipka and Borsuk dropped in the stairwell during their flight from the librarians. The district court, refusing to "create an artificial distinction" by drawing a line at either the objects' cabinet or at the Special Collections' door, instead drew an artificial line at the library door to the outside, and declared that the robbers actually "took" only those objects they carried through that door, but not those they discarded, dropped, or abandoned within the library. But, the *ad hoc* approach of choosing one arbitrary line in favor of a different arbitrary line is inherently unfair, because it is incapable of principled explanation or extension. Using the arbitrary line chosen by the district court yields this result: any (all) objects dropped just outside the library door are to be counted, while those dropped just inside the library are not, even though there is no realistic difference between the two scenarios other than the few strides of a fleeing robber — the objects would still have been undamaged and the librarians would still have returned them to their proper places before the police arrived to document the scene.

In *United States v. Parker*, 903 F.2d at 105, the Second Circuit was asked to consider whether certain cash left behind when robbers abandoned a stolen payroll car should be considered taken. The court began: "Property removed from its rightful owner is properly considered taken even if it is immediately thereafter recovered." *Id.*; *accord United States v. McCarty*, 36 F.3d 1349, 1361 (5th Cir. 1994) ("There is no requirement that this amount ['taken'] be offset by the amount recovered, for the purposes of determining the offense level."); *see also United States v. Napier*, 21 F.3d 354, 355 (9th Cir. 1994) ("When the defendant is apprehended in the process of the robbery, the amount of the loss can mean the potential loss had he not been apprehended.")

The *Parker* court continued: "Plainly [the robbers] exercised dominion and control over the [payroll] car and its contents. The fact that they did not transfer all of the cash from the stolen car to their getaway car does not mean that they had not taken it." *Parker*, 903 F.2d at 105. This same reasoning appears in *United States v. Cover*, 199 F.3d 1270, 1276 (11th Cir. 2000), in which the court was asked to consider whether to include certain funds left in a bank vault "that, but for the intervention of the police, [the robber] would have successfully seized." The *Cover* court counted the abandoned cash, concluding that the robber had completed the acts necessary to seize the cash (i.e., had exerted dominion and control), and the mere intervention of the police did not mean that he had not "taken" the money for purposes of determining the offense level. *Id*.; *accord United States v. Manna*, 92 F. App'x 880, 889 (3d Cir. 2004) ("Because, by definition, the recovered stolen funds were not returned to the bank until after the robbery was committed and discovered, those funds cannot operate to reduce the amount of 'loss' within the meaning of U.S.S.G. § 2B3.1(b)(1).").

In *United States v. Cruz-Santiago*, 12 F.3d 1 (1st Cir. 1993), the First Circuit was asked to consider whether a car, seized by robbers and driven from the scene to another getaway vehicle, was a robbery-related "loss" under the guidelines. Then Chief Judge Breyer, writing for the court, began: "the Guidelines do not limit the Commentary's word 'taken' to circumstances involving a '*permanent*' deprivation of property." *Id*. at 3. From that beginning, the court continued: "the Guidelines here are concerned with punishment, not restitution; and, they consequently focus on the fact that the offender's behavior created a significant risk of loss — a risk that existed whether or not the property owner eventually suffered harm." *Id*. (citations omitted).

Based on our reading of the cases and the guidelines, we hold that a robber "takes" an object, for purposes of § 2B3.1, when the robber exercises dominion and control over that object, such that the robber has completed the acts necessary to seize that object. In the present case, Lipka and Borsuk took "dominion and control" over: (1) *Hortus Sanitatis*, (2) the 20 pencil drawings, (3) *Synopsis of the Birds of North America*, (4) *Origin of Species*, (5) *Illuminated Manuscript*, (6) all four volumes of *Birds of North America*, and (7) two of the three volumes of *Quadrupeds*. With the exception of the third volume of *Quadrupeds* — which, we conclude, did not fall within their dominion and control as they were unable to remove it from its drawer and complete the acts necessary to carry that object away — the robbers collected all seven of the objects and prepared to carry them away. During this time they clearly had dominion and control over these objects — they moved them at will; they could have damaged them, destroyed them, hidden them, played with them, or — as they did — prepared them to be carried away.

When the mass of objects proved too cumbersome, they abandoned some and fled with the rest — into the elevator, back out of the elevator, and towards the door. When they were caught and assailed by Ms. Brown, they dropped some more objects, but not before they had carried them from the Special Collections Department to the first floor exit, during which time they most assuredly had the objects within their dominion and control, as they were carrying them away. Just because they did not cross the library threshold with these objects does not mean they had not taken them. Moreover, just because they did not cross the library threshold does not mean they did not exercise dominion and control. Ordinarily, these objects would not be allowed out of the secure Special Collections Department — it was only by Lipka's and Borsuk's exercise of dominion and control that the objects were removed from Special Collections to the first-floor stairwell.

Thus, we conclude that the objects to be used for the valuation of loss include the five objects actually removed from the library proper (i.e., *Hortus Sanitatis*, the 20 pencil drawings, *Synopsis of the Birds of North America*, *Origin of Species*, and *Illuminated Manuscript*), as well as the two volumes of *Birds of North America* and two volumes of *Quadrupeds* that were dropped in the stairwell. Note that the other two volumes of *Birds of North America*, those left atop the pink bed sheet, are not being excluded because they were not "taken" — they were — they are excluded

because the government has not pressed this position on appeal, and we will not do so now on our own initiative. Based on this measure of loss, the value — even under the defendants' valuation estimates — is more than $1,000,000, the sentence enhancement is 16 rather than 14, and the advisory guideline range is 108 to 135 months rather than 87 to 108 months. Consequently, we must remand to the district court to reconsider its sentence in light of this opinion.

## III.

Accordingly, we **AFFIRM** the district court's conclusions that the government did not breach the cooperation agreement it had with Allen; that Allen was not a "minor participant" in the offense; and that the use of the "stun pen" justified an enhancement for use of a dangerous weapon. Because we find, however, that the district court erred in its calculation of loss for purposes of determining the offense level — and, therefore, the advisory guideline ranges — for each of the defendants, we **VACATE** the sentences and **REMAND** for resentencing consistent with this opinion.