**Kenneth CARDONA, Petitioner,**

v.

**Glen S. GOORD, Commissioner, Department of Correctional Services for the State of New York, Respondent.**

**No. 06–cv–3840 (ADS).**

United States District Court,
E.D. New York.

Sept. 21, 2011.

---

Alan M. Nelson, Esq., Lake Success, NY, for the petitioner.

Thomas J. Spota, District Attorney By Assistant District Attorney Glenn Green, Riverhead, NY, for the respondent.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

The presently incarcerated petitioner Kenneth Cardona brings this petition for writ of *habeas corpus* pursuant to 28 U.S.C. § 2254, on grounds that he was denied his constitutional rights through (1) improper remarks by the prosecutor at his trial during the prosecutor's opening statement, (2) the trial judge's failure to properly instruct the jury concerning accomplice testimony, and (3) a verdict that was unsupported by the evidence at the trial. For the reasons that follow, the Court denies the petition in its entirety.

## I. BACKGROUND

### A. Factual Background

On December 8, 1999, a man named Donnie Meyer was gruesomely killed by a group of acquaintances in the home of the petitioner Kenneth Cardona, at 112 Willow Avenue, Central Islip, New York. Four men, including Cardona, were ultimately convicted in connection with this killing, and four more men who were present for various parts of the events surrounding Meyer's death provided the state's chief testimony at the trial. The testimony of these four men is not substantially challenged for purposes of this petition, and the Court primarily relies on that testimony for the following discussion of the factual background in this case.

On the morning of December 8, 1999, a man named Arthur Morace, one of the state's central witnesses at the trial, contacted the decedent Donald "Donnie" Meyer to seek his help in obtaining angel dust, an illegal drug. Meyer was acquainted with Morace, and to get the drugs, Meyer turned to another friend, Anthony Torres—also a key state witness—for help. Torres had "connections" to drugs in Manhattan, (Tr. at 2027:21), and agreed with Meyer to meet Morace later in the day to drive to Manhattan.

About 2:30 that afternoon, Meyer and Torres, along with two other friends, drove to meet Morace in a shopping center parking lot located near the Sunrise Highway in western Suffolk County, New York. What Meyer did not know was that Morace's request for angel dust was a ruse orchestrated by one James Argentina, who, like the petitioner, was later convicted of kidnapping Meyer. Argentina had once roomed with Meyer, and believed that Meyer had "snitched" on him to authorities. (Tr. at 1634:7.) On December 8, 1999, Argentina had very recently been released from prison after serving a sentence that he blamed on Meyer, and he sought to confront Meyer about this. Apparently sensing that Meyer would not agree to voluntarily meet him, Argentina

asked Morace to make a false request for drugs, and then planned to accompany Morace to meet with Meyer.

Argentina had also coordinated his ruse with three other men who wanted to confront Meyer on a different subject. These three men—the petitioner Cardona, one Najee Player, and one Dowan Myers—believed that Meyer had information about a recent incident in which someone "kicked down the door and started shooting" at Cardona's home at 112 Willow Avenue, Central Islip, New York. (Tr. at 3360:9–10.) Argentina therefore planned that, upon meeting with Meyer, he would bring him to 112 Willow Avenue, where Cardona, Player, and Myers would be waiting for him.

When Meyer and Torres arrived at the shopping center, they found not only Morace, but also Argentina. In the parking lot, "[e]verybody gave hellos and shook hands and [gave] kisses," (Tr. at 2031:14–15), and although Meyer "look[ed] nervous" (Tr. at 2031:10), he agreed to get into the back seat of Argentina's car. Outside of Meyer's hearing, Argentina now let Torres in on the plan, telling him that they were planning to drive to the home of the petitioner Cardona, who lived nearby. (See Tr. at 2033:18–21.) Morace and Torres then each got into the back seat of Argentina's car, so that Meyer was in the center of the back seat. Argentina sat in the front seat of the car, and a man named Darrin McKiernan—whose involvement in the day's events was limited—drove the car.

The group then left the parking lot. Although Meyer did not yet know that they were headed to Cardona's home, he knew Cardona and was familiar with his address. Thus, as the car approached the street that Cardona lived on, Meyer presumably deduced where the group was headed, and accused Argentina of "set[ting him] up." (Tr. at 1631:19–20.) Argentina responded that they were "just going to talk." (Tr. at 1631:20–21.) The party then proceeded to Cardona's home.

Cardona lived in a first floor apartment at 112 Willow Avenue, which was a two-apartment home. Upon arrival at that address, Argentina entered Cardona's apartment, while Torres, Morace, Meyer, and McKiernan remained in the car. After a brief period, Argentina motioned for Torres, Morace, and Meyer to follow him into the house, which they did. McKiernan also exited the car, but did not enter the house.

Inside the apartment waited Meyer's soon-to-be assailants—Argentina, Cardona, Myers, and Player. Also in the apartment was a man named George Rajotte, who lived with Cardona at 112 Willow Avenue. At the trial, Torres, Morace, and Rajotte all described what happened next, and although their accounts diverge on minor details, the general outline is clear.

Almost as soon as Meyer entered the house, Argentina confronted Meyer over having informed on him, and Cardona confronted Meyer over being involved with the alleged shooting. When Meyer denied knowledge of either event, Argentina and Cardona each punched Meyer in the face. Then almost immediately—Rajotte describes it as happening even before anyone attacked Meyer—one or more of Argentina, Cardona, Myers, or Player frisked Meyer for a gun. Finding a pistol in the back of Meyer's pants, they forcibly removed it.

Very shortly after removing the gun from Meyer's person, Najee Player attacked Meyer with a baseball bat. At this point, George Rajotte left the room, retreating to his bedroom. Arthur Morace remained, and testified that he watched Player hit Meyer in the legs with "hard whacks, like he was hitting a baseball," (Tr. at 1634:16–17), while Dowan Myers

held Meyer down. After four or five hits, Morace also left the room and went outside. Of the three witnesses present, only Anthony Torres remained through the whole beating, and he later testified that Player hit Meyer "like three or four times ... like he wanted to hit a home run, hard, from all the way back." (Tr. at 2041:22–2042:6.) Torres further testified that Cardona also then hit Meyer with the bat multiple times, and that Player and Cardona again hit Meyer with the bat in the kneecaps, while Myers and Argentina held Meyer down. (See Tr. at 2043:9–12.)

Player then retrieved a roll of masking tape, and "taped in a circular formation around [Meyer's] eyes and mouth." (Tr. at 2044:7–8.) Morace, who at that point came back into the house, described Meyer as having "[h]is hands [ ] taped up and his face [ ] wrapped like a mummy." (Tr. at 1635:16–18.) Following this restraint, Player then burned Meyer's hair with a cigarette lighter and hit Meyer's left index finger with a hammer. Cardona then instructed Torres to remove Meyer's jewelry and his beeper, because Meyer "would not be needing it anymore." (Tr. at 2048:16.) Torres complied, and along with taking the beeper and jewelry, he also removed the tape from Meyer. Torres later plead guilty to robbery in connection with taking the jewelry and beeper.

This marked the end of what ultimately was only the first phase of the physical attack on Meyer. Leaving Meyer "bleeding" and "unconscious", (Tr. at 2049:3–6), all of the other men in the house except for Rajotte—who remained in his room—left the apartment. Outside, there was a discussion of how to keep all involved from revealing what had happened, as well as a discussion of what to do with Meyer. According to Morace, Cardona asked during this conversation whether they should bring Meyer to a hospital, to which Argentina replied, "I don't care, do whatever, get

rid of him, bring him to a hospital, I really don't care." (Tr. at 1637:9–11.)

Ultimately, Cardona resolved the problem of what to do with Meyer. Knowing that Rajotte had been arranging to move into a then-empty apartment in Blue Point, New York, Cardona instructed Myers and Player to get Rajotte, and together to take Meyer to that apartment. Having given this instruction, Cardona, Argentina, Torres, and Morace left the residence in the car driven by McKiernan, who had waited outside during the entire event. Except for Cardona, none of these five returned again that day to 112 Willow Avenue.

Meanwhile, Myers, Player, and Rajotte brought Meyer, who "couldn't walk himself," (Tr. at 2608:6–7) to a second car, and drove east to Blue Point. Rajotte "had been told to tell [the landlord at the house he was planning to rent] that [Meyer] fell off a motor cycle [sic] and got these injuries and needed a place to recuperate." (Tr. at 2608:21–24.) However, Rajotte later testified that, upon arriving at the house, he surreptitiously told the landlord that Meyer had been beaten up, and the landlord refused to let the men in the apartment. The four therefore returned to 112 Willow Avenue, where they brought Meyer to a back bedroom in the home.

Once back at 112 Willow Avenue, Rajotte gave Meyer water and Motrin, and then sat down on a couch in the apartment's main room next to Cardona, who had also returned. Cardona then told Rajotte that Meyer "won't be missed by anybody," and that "[h]e is not going to leave here alive." (Tr. at 2611:3–4.) Shortly thereafter, a visitor arrived at 112 Willow Avenue, and upon Rajotte's request, the visitor agreed to drive Rajotte to his parents' house. Rajotte then remained at his parents' house until later that afternoon, when Cardona and Player arrived and asked Rajotte to return to 112 Willow Ave-

nue to "help clean up." (Tr. at 2613:11.) Rajotte agreed to do so.

Upon returning to 112 Willow Avenue, Rajotte went to his room, which was next to the room where Meyer still lay. Soon Rajotte heard "bludgeoning sounds," coming from the room next door, and saw Najee Player walking back and forth with a "swivel base from an office chair," while "yelling and ranting and raving" at Meyer. (Tr. at 2614:11–2615:1.) This went on for "a good couple of minutes" (Tr. at 2615:3), after which Player emerged from the room and said, "don't worry about it, fuck him, he is dead." (Tr. at 2615:21–22.)

Around 10:30 that evening, the fourth key prosecution witness, Maurice Brown, arrived at 112 Willow Avenue. Brown was a brother of Dowan Myers, and had been living at 112 Willow Avenue with Cardona until the alleged shooting. Upon entering the house, Cardona presumably told Brown that Meyer had been killed, and then told him that he wanted him to "dig a hole," (Tr. at 3373:10), to put Meyer's body in. At the trial, Brown testified that Cardona further warned him that "if we didn't do it, that we was going to be in the hole too." (Tr. at 3373:15–16.) Cardona issued Rajotte the same instruction and threat.

Complying, Rajotte drove Brown, Player, and Myers a short distance to an area just north of the Southern State Parkway. There, Brown, Player, and Myers proceeded to dig a grave for Meyer's body. Rajotte meanwhile drove back to 112 Willow Avenue, where Brown followed on foot after digging the hole. At 112 Willow Avenue, Brown, Rajotte, Cardona, and James Argentina's father placed Meyer's body in the back of a car, and then Brown and Rajotte drove Meyer's body to the newly-dug grave. Upon arriving at the gravesite, Brown and Meyer placed the body into the hole and covered it with dirt. Rajotte then drove back to 112 Willow Avenue, while the other three men walked there.

Back at Cardona's residence, the men changed clothes and began the process of cleaning the apartment.

## B. Procedural Background

The killing of Donnie Meyer was ultimately uncovered by police, and Cardona, Argentina, Player, and Myers were all indicted for various related crimes, including conspiracy, kidnapping, and felony murder. On April 16, 2001, the day before a joint trial was scheduled to commence in the cases against all four men, Suffolk County Court Judge John N. Mullin granted a motion to partially sever the trial of Donnie Myers, who had made inculpatory statements to the police. Because Myers was not planning to testify, the judge ruled that admitting a confession by Myers against the other defendants would violate their constitutional right to confrontation. He therefore directed that two juries would be seated: one that would hear all of the evidence *including* the confession by Myers, and one that would hear all of the evidence *except* this confession. The first jury, which would also hear separate opening and closing statements, would consider the charges against Myers alone, while the second jury would consider the charges against the remaining three defendants.

On May 2, 2001, the prosecuting attorney offered his opening statement to the jury hearing the case against Cardona, Argentina, and Player. During that statement, the prosecutor asserted:

> You are also going to hear that during the course, that eventually, eventually information is received and actually it is the defendant Myers that takes detectives from the homicide to the location of the body and there is an exhumation of the body that is done at that time.

(Tr. at 1324:11–17.)

After the prosecutor concluded his opening remarks, defense counsel objected and

moved for a mistrial, on grounds that the prosecutor's statement violated the trial judge's ruling excluding Myers' confession from Cardona's, Argentina's, and Player's cases. In response, Judge Mullin held that the prosecutor's statement "shouldn't have been made," but that because the prosecutor's statement did not "include any reference to any codefendant on trial here," it did not deprive the defendants of a fair trial. (Tr. at 1342:17–25.) Judge Mullin did, however, issue the following curative instruction to the jury:

> Ladies and gentlemen, at the end of [the prosecutor's] opening remark, he made an observation or a comment that the defendant Dowan Myers led the police to the body in this case.
>
> That comment and observation by [the prosecutor], however inadvertent it had been, was an improper remark. And there will be no evidence of any such thing having happened.
>
> You are to disregard it and give it no consideration whatsoever for any purpose.
>
> As I told you in the beginning, opening statement is not argument, and it is not evidence. And that particular statement is not to figure in this case again, for any reason whatsoever.

(Tr. at 1351:13–1352:6.)

The trial then proceeded. During the government's case, the prosecution presented numerous witnesses, including Torres, Morace, Rajotte, and Brown. The defendants put on only one witness, and none of the defendants testified. At the ensuing charge conference, the defendants sought an instruction to the jury that Torres, Morace, Rajotte, and Brown were accomplices of the defendants, and that under New York law, their testimony could support a conviction only if corroborated. See N.Y.Crim. Proc. L. § 60.50 ("A defendant may not be convicted of any offense upon the testimony of an accomplice un-

supported by corroborative evidence tending to connect the defendant with the commission of such offense."). Judge Mullin granted the request in part, and on June 20, 2001, after both sides had offered closing arguments, he instructed the jury that (1) Torres was an accomplice of the defendants, and that his testimony required corroboration to support a conviction; and (2) the jury must determine whether Morace and Rajotte were the defendants' accomplices, and that if they were, their testimony required similar corroboration. However, Judge Mullin held that Brown was not the defendants' accomplice, and therefore gave no specific instruction concerning Brown's testimony.

On June 22, 2001, the jury returned a verdict against the petitioner Cardona, finding him guilty of (1) fourth degree conspiracy, N.Y. Penal L. § 105.10–01; (2) second degree kidnapping, N.Y. Penal L. § 135.20–00; (3) first degree kidnapping, N.Y. Penal L. § 135.25–03; and (4) second degree murder, N.Y. Penal L. § 125.25–03. Cardona appealed the convictions, and on April 25, 2005, the Appellate Division Second Department affirmed Cardona's conviction. *People v. Cardona*, 17 A.D.3d 692, 793 N.Y.S.2d 542 (2d Dep't 2005). Cardona then sought a writ of certiorari to appeal to the New York State Court of Appeals. On July 6, 2005, 5 N.Y.3d 786, 801 N.Y.S.2d 807, 835 N.E.2d 667, that request was denied.

On August 3, 2006, Cardona timely commenced the present petition for writ of *habeas corpus* in this Court. Cardona amended his petition once, and on September 22, 2006, the state responded to the amended petition. Although Cardona originally commenced this action *pro se,* the Court later appointed an attorney for Cardona under the Criminal Justice Act of 1964. Cardona's counsel thereafter requested multiple extensions of time to file

a supplementary memorandum of law, which he ultimately filed on February 23, 2009. In that memorandum of law, Cardona's attorney noted the withdrawal of several of Cardona's original claims, and pursued only three bases for the writ, namely that: (1) the prosecutor's statement during his opening statement concerning the discovery of Meyer's body deprived Cardona of a fair trial and his right to confrontation; (2) the trial judge's failure to name Morace, Rajotte, and Brown as accomplices in the jury charge and to require corroboration for their testimony deprived Cardona of a fair trial; and (3) there was insufficient evidence at trial to prove that Cardona had the mental state required for the charge of kidnapping, and that further, without proof of kidnapping, the felony murder charge that was predicated on the commission of kidnapping was improper. The state filed no response to this supplementary memorandum of law.

## II. DISCUSSION

### A. Standard of Review

Cardona files this petition pursuant to 28 U.S.C. § 2254(d), which provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A petitioner will prevail on a claim under Section 2254(d)(1) only if he can show that "the state court arrive[d] at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law or if the state court decide[d] a case differently than [the United States Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Relatedly, a petitioner will prevail on a claim that insufficient evidence supported the state court's finding only if "upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *see also McDaniel v. Brown*, —— U.S. ——, 130 S.Ct. 665, 175 L.Ed.2d 582 (2010) (reaffirming the standard of review set forth in *Jackson*). Further, a state court's determination of a factual issue is presumed to be correct, and may only be rebutted upon a showing of clear and convincing evidence by the petitioner. Section 2254(e)(1). Finally, in analyzing the sufficiency of the evidence at trial, the Court must "look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir.1999).

### B. As to the Prosecutor's Remarks in Opening Statement

The petitioner Cardona first asserts that the prosecutor's remarks concerning the discovery of Meyer's body violated his fifth and fourteenth amendment rights to a fair trial and his sixth amendment right to confront witnesses against him.

As a general matter, an inappropriate statement by a prosecutor during argument will entitle a petitioner to *habeas corpus* relief only when the petitioner can

demonstrate that the comments "had a substantial and injurious effect or influence in determining the jury's verdict." *Bentley v. Scully,* 41 F.3d 818, 824 (2d Cir.1994). In deciding whether a petitioner has shown this, the Court must consider, among other things, "(1) the severity of the prosecutor's conduct; (2) what steps, if any, the trial court may have taken to remedy any prejudice; and (3) whether the conviction was certain absent the prejudicial conduct." *Id.*

Here, the Court finds that the prosecutor's statement, taken in the context of the curative instruction provided by the trial judge, did not produce an error of constitutional dimensions. To be sure, the reason for empanelling a separate jury for Myers was to protect the other defendants from the confession that Myers had made to the police. However, as both Judge Mullin and the Second Department noted, the prosecutor's statement did not expressly indicate that Dowan Myers made any particular statement to the police. *See* Tr. at 1342:17–25; *Cardona,* 17 A.D.3d at 693, 793 N.Y.S.2d 542. Rather, the prosecutor stated that, "eventually information is received," and that it was then "Myers that takes detectives from the homicide to the location of the body." (Tr. at 1324:11–17.) While the prosecutor's statement is inappropriately suggestive, it bears consideration that the prosecutor did not in fact relate that Myers confessed to any crime, or that he knew the location of the body because he participated in a crime. Moreover, the statement was fleeting, and was made weeks before Cardona was convicted on what was otherwise very substantial evidence. Finally, the statement was also addressed by the trial judge with a firm curative instruction. *See, e.g., U.S. v. Reyes,* 18 F.3d 65, 71–72 (2d Cir. 1994) ("Ordinarily we assume that juries will follow limiting and curative instructions[, except where] prejudice is so severe that such instructions are unlikely to be

effective."). The Court therefore finds that this ground for a writ of *habeas corpus* is without merit.

## C. As to the Jury Instructions Concerning Accomplice Testimony

■ Cardona also maintains that Judge Mullin's failure to charge the jury to require corroboration of the testimony from Morace, Rajotte, and Brown violated his constitutional rights to a fair trial. Initially, there is some dispute as to whether this claim was properly preserved. Nevertheless, the Court finds on the merits that this claim cannot form the basis for *habeas corpus* relief, and thus addresses the petitioner's arguments without addressing this procedural question.

United States District Judge John Gleeson confronted an identical argument raised by the petitioner's co-defendant Najee Player in dismissing Player's petition for writ of *habeas corpus. See Player v. Artus,* No. 06-cv-2764, 2007 WL 708793, *5 (E.D.N.Y. Mar. 6, 2007). In that opinion, Judge Gleeson stated:

Player asserts that he is entitled to habeas relief on due process grounds because the trial judge failed to conclude that Brown, Rajotte, and Morace were accomplice witnesses, and failed to instruct the jury that a defendant may not be convicted based solely upon the uncorroborated testimony of an accomplice witness, pursuant to N.Y.Crim. Proc. Law § 60.22. Because Player failed to object on these grounds at trial, the Appellate Division found this claim unpreserved for appellate review, and "in any event" the court rejected the claim on the merits, see [*People v.*] *Player,* [17 A.D.3d 701] 793 N.Y.S.2d [536] at 536–38 [536–37 (2d Dep't 2005)].

As an initial matter, I note that Player's § 60.22 claim sounds in state law exclusively, and does not present a federal

due process claim. In spite of Player's citation to the Due Process Clause in his brief to the Appellate Division, there is no federal analog to the protection afforded by § 60.22 of New York's Criminal Procedure Law. To the contrary, under federal law a defendant may be convicted based on the uncorroborated testimony of an accomplice witness without violating the Due Process clause, "so long as that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt." *United States v. Gordon*, 987 F.2d 902, 906 (2d Cir.1993); see also *United States v. Parker*, 903 F.2d 91, 97 (2d Cir.1990); *Smithwick v. Walker*, 758 F.Supp. 178, 186 (S.D.N.Y.1991) ("[T]he requirement of accomplice corroboration is solely a matter of New York State law.")

. . .

Nor has Player demonstrated that he was prejudiced by the trial court's decision; it is apparent from the trial record that there was more than sufficient corroboration for the testimony of Brown, Rajotte and Morace to meet the requirements of the state statute. . . .

Finally, Player's claim has no merit. Brown arrived at the apartment only after the kidnapping and murder of Meyer was already complete, and neither Rajotte nor Morace actively participated in the kidnapping and killing to the degree the four codefendants participated. The state court's finding that Brown was not an accomplice for the purposes of § 60.22, and that "different inferences regarding the complicity" of Rajotte and Morace could reasonably have been drawn, were not unreasonable in light of the evidence presented.

Accordingly, I reject Player's claim that the state court violated his due process rights when it failed to instruct the jury

regarding the corroboration requirement of N.Y.Crim. Proc. Law § 60.22 *Id.* at **5–6.

 The Court finds Judge Gleeson's analysis of this issue to be appropriate and compelling. Here, the petitioner Cardona acknowledges that federal law does not require accomplice testimony to be corroborated to support a conviction. While the Second Circuit has noted that "trial judges should call the jury's attention to their duty to scrutinize the testimony of accomplices and informers," *U.S. v. Swiderski*, 539 F.2d 854, 860 (2d Cir.1976), there is no indication here that Judge Mullin's instructions failed to accomplish this end. Moreover, having reviewed the record in detail, the Court agrees with both Judge Gleeson and the Appellate Division that it was appropriate for Judge Mullin to allow the jury to determine the issue of whether Morace and Rajotte were accomplices, and to hold that Brown was not an accomplice. *See Cardona*, 17 A.D.3d at 693, 793 N.Y.S.2d 542. The request for relief on this ground is therefore also without merit.

### D. As to the Sufficiency of the Evidence Supporting Cardona's Kidnapping and Murder Convictions

 Finally, Cardona challenges the sufficiency of the evidence that underlies his kidnapping and murder convictions. Specifically, he maintains that there was insufficient evidence to establish an abduction of Meyer, and that without this element, both of his kidnapping convictions, as well as his felony murder conviction, must be reversed.

As a preliminary matter, Cardona is correct that, absent the element of abduction, Cardona's convictions for kidnapping, as well as his conviction for felony murder—which is predicated on the kidnapping offenses—cannot stand. However, having reviewed the parties' papers and the rec-

ord, the Court finds that the petitioner has not met his burden in challenging the evidence supporting these convictions.

New York State Penal Law § 135.20 provides that "[a] person is guilty of kidnapping in the second degree when he abducts another person." New York law in turn defines "abduct" to mean "to restrain a person with intent to prevent his liberation by either (a) secreting or holding him in a place where he is not likely to be found, or (b) using or threatening to use deadly physical force." N.Y. Penal L. § 135.00(2). Although the term "restrain" is also expressly defined in the penal code, that definition does not affect the outcome of this petition, and the Court need not set it forth. However, "deadly physical force," a term used in the definition of "abduct", is relevant here, and is defined to mean "physical force which, under the circumstances in which it is used, is readily capable of causing death or other serious physical injury." N.Y. Penal L. § 10.00(11). "Serious physical injury" is in turn described as "physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ." N.Y. Penal L. § 10.00(10).

Under New York law, first degree kidnapping is identical to second degree kidnapping, except that, as relevant to this case, the victim also "dies during the abduction or before he is able to return or to be returned to safety." N.Y. Penal L. § 135.25. Finally, the second degree murder provision of which Cardona was convicted provides that "[a] person is guilty of murder in the second degree when: ... Acting either alone or with one or more other persons, he commits ... kidnapping, ... and, in the course of and in furtherance of such crime ..., he, or another participant, ... causes the death of a person other than one of the participants...."

Cardona does not deny in his petition that he restrained Meyer, but rather maintains that he never did so "with intent to prevent his liberation", Section 135.00(2), as required to establish the element of abduction, and in turn, to establish the crime of kidnapping. To the contrary, Cardona maintains that his intent was, first, to restrain Meyer for the purpose of confronting and assaulting him, and then later, to restrain Meyer for the purpose of killing him. According to Cardona, the evidence at trial admitted of no time in which he intended to prevent Cardona's liberation.

Cardona's argument is essentially a species of what New York courts have referred to as the "kidnap merger doctrine," a doctrine that addresses an anomaly caused by New York's broad definition of kidnapping. Taken literally, New York's kidnapping statutes could be applied to crimes such as assault, robbery, and rape that in many cases inherently include an abduction, but which were not intended to be charged as kidnappings. *See, e.g., People v. Gonzalez*, 80 N.Y.2d 146, 152, 603 N.E.2d 938, 589 N.Y.S.2d 833 (N.Y.1992). The doctrine is generally summarized to require courts to consider "whether the restraint [forming the basis for a kidnapping conviction] was 'so much the part of another substantive crime that the substantive crime could not have been committed without such acts and that independent criminal responsibility may not fairly be attributed to them.'" *Id.* at 153, 589 N.Y.S.2d 833, 603 N.E.2d 938 (quoting *People v. Cassidy*, 40 N.Y.2d 763, 767, 358 N.E.2d 870, 390 N.Y.S.2d 45 (N.Y.1976)).

Here, the petitioner states that he "recognizes that he is precluded from arguing the application of the merger doctrine" to this case. (Pet.'s Supp. Mem. L. at 16.)

Nevertheless, the petitioner pursues what, in the Court's view, amounts to a merger doctrine argument. According to the petitioner, the state did not prove abduction at trial because "there was no evidence presented to demonstrate that Meyer was restrained for any independent purpose other than to first confront and then assault him." (*Id.* at 14.) Similarly, the petitioner asserts that the state did not prove an intent to abduct because "there is no evidence to demonstrate that the restraint [of Meyer] occurred until *after* the intent to murder the victim was formed." (*Id.* at 17 (emphasis in original).)

The petitioner recognizes that there is some doubt as to whether the merger doctrine may apply when, as here, a felony murder charge is based on a first degree kidnapping charge. *See People v. Pellot,* 105 A.D.2d 223, 234, 483 N.Y.S.2d 409 (2d Dep't 1984) ("to apply the kidnap merger doctrine to the crime of kidnapping in the first degree would be to thwart the clear intent of the Legislature without furthering the ameliorative purpose of the merger doctrine"). Nevertheless, even assuming that the kidnap merger doctrine could legally apply to the charges against the petitioner, the Court finds that there remains sufficient evidence to support Cardona's convictions.

As noted above, "abduction" under New York penal law requires restraint "with intent to prevent [the victim's] liberation," accomplished by, among other potential means, use of deadly physical force or secretion. N.Y. Penal L. § 135.00(2). Here, Torres, Morace, and Rajotte described in detail the initial brutal beating of Meyer, as well as his subsequent transportation to Blue Point. The Court finds that this testimony provided sufficient evidence for a "rational trier of fact," *Jackson,* 443 U.S. at 324, 99 S.Ct. 2781, to conclude that Cardona and his accomplices

"abducted" Meyer, as that term is defined under the law.

The description of Player and Cardona hitting Meyer in the legs and knees "like he wanted to hit a home run," (Tr. at 2042:4–5), could convince a rational trier of fact that Cardona and company used deadly physical force with the intent of preventing Meyer from leaving 112 Willow Avenue. Indeed, as Meyer thereafter "couldn't walk," (Tr. at 2608:6–7), this is a reasonable conclusion. Similarly, the taping of Meyer's mouth and eyes could be construed by a rational trier of fact to reflect an intent to prevent Meyer from, literally, seeing his way out of the residence. In the Court's view, a rational jury could have concluded from this that Cardona intended to prevent Meyer's liberation *separately* from his intention to assault him.

Likewise, Cardona's subsequent order that Meyer be taken to a vacant apartment in Blue Point, New York could be reasonably understood to reflect a separate intent to prevent Meyer's liberation through secretion. While Meyer remained at the Blue Point address only briefly, this reflects no lack of intent or action, but only the property owner's unexpected refusal to accept Meyer into his apartment. In the Court's view, a rational juror could view this transportation as an act of abduction wholly separated from the killing of Meyer that followed. The Court therefore cannot agree with the petitioner's assertion that a jury would be compelled to find that the transportation of Meyer to Blue Point was "an inseparable part of the murder of Meyer and the efforts to conceal it." (Pet. Supp. Mem. L. at 18.)

The petitioner similarly asserts that restraint of Meyer was also for the purpose of "confront[ing]" Meyer and "conceal[ing] the evidence of the assault," and that he therefore never intended to prevent Mey-

er's liberation. (Pet.'s Supp. Mem. L. at 14, 19.) However, this argument merely confuses *motive* with *intent*. While the jury may have concluded that Cardona's actions were *motivated* by (1) a desire to confront Meyer about the shooting and, (2) a desire to hide the evidence of the subsequent beating, this would not preclude a rational fact finder from also concluding that, to satisfy these motives, Cardona *intended* to prevent Meyer's liberation.

Finally, the petitioner also argues that Cardona formed an intent to murder Meyer directly following Meyer's initial beating with a baseball bat, and that once this intention was formed, Cardona could have no separate intent to prevent Meyer's liberation. This argument is immaterial because the Court is satisfied that there is sufficient evidence that an abduction took place even before the point at which the petitioner claimed that he formed the intention to murder Meyer. Moreover, even if such evidence did not exist—and even if the petitioner's merger argument were legally supportable—the assertion remains inapposite. Based on the record, it is the Court's view that a rational trier of fact could readily conclude that Cardona did not form an intention to murder Meyer until *after* Meyer returned from Blue Point. Indeed, Cardona's order to have Meyer taken to Blue Point would have made little sense if his intent at that time was to murder Meyer in his own home. Thus, there is no bar to a rational fact finder finding that the secretion of Meyer at Blue Point also constituted an abduction.

The Court therefore finds that the petitioner's claim of evidentiary insufficiency is without merit.

## III. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that Cardona's petition for writ of *habeas corpus* is denied in all respects; and it is further

**ORDERED** that the Clerk of the Court is respectfully directed to mark this case closed.

**SO ORDERED.**